FILED

2007 NOV 26 PM 1:54

RICHARD W. WIEKING
CLERK
U.S. DISTRICT COURT
NO DIST OF CA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

FUNAI ELECTRIC COMPANY, LTD.,       No. C-04-01830 JCS

        Plaintiff,

        v.

DAEWOO ELECTRONICS CORP., ET AL.,

        Defendants.

**ORDER RE SUMMARY JUDGMENT MOTIONS** [Docket Nos. 376, 379, 380, 381, 382, 383, 385, 390]

FILED UNDER SEAL

**United States District Court**
For the Northern District of California

## I. INTRODUCTION

In this case, Funai asserts that Defendants Daewoo Electronics Corporation and Daewoo Electronics America, Inc. ("Daewoo")[1] have infringed six of its patents: United States Patent Nos. 6,021,018 (filed Jan. 16, 1998) ("'018 patent"), 6,064,538 (filed Feb. 17, 1998) ("'538 patent"), RE37,332 (originally filed June 1, 1995, reissue filed June 18, 1998) ("'332 patent"), 6,421,210 (filed April 28, 2000) ("'210 patent"), 5,815,218 (filed Jan. 4, 1996) ("'218 patent"), and 5,987,209 (filed April 3, 1995) ("'209 patent"). All six patents relate to various electrical and mechanical components found in video cassette players and recorders ("VCRs"). Daewoo, in turn, asserts counterclaims as to each patent seeking declaratory relief in the form of judicial determinations that: 1) the patent is invalid; and 2) the accused products do not infringe the patent.

The court, with District Judge Charles Breyer presiding, issued a Claim Construction Order on March 1, 2006. Subsequently, with the consent of all of the parties that remain in the action, the

---

[1] The remaining Defendants have been terminated from the case due to settlement or entry of default judgment against them.

1 case was transferred to the undersigned magistrate judge. Currently before the court are the

2 following summary judgment motions:

3 1) Plaintiff's Motion for Partial Summary Judgment on U.S. Patent No. 6,021,018 ("Plaintiff's Summary Judgment Motion ('018 Patent)") [Docket No. 376];

4

5 2) Motion of Daewoo Electronics Corporation and Daewoo Electronics America, Inc., for Partial Summary Judgment on U.S. Patent No. 5,987, 209 ("Defendants' Summary Judgment Motion ('209 Patent)") [Docket No. 379];

6

7 3) Motion of Daewoo Electronics Corporation and Daewoo Electronics America, Inc., for Partial Summary Judgment on U.S. Patent No. 6,421,210 ("Defendants' Summary Judgment Motion ('210 Patent)") [Docket No. 380];

8

9 4) Motion of Daewoo Electronics Corporation and Daewoo Electronics America, Inc., for Partial Summary Judgment on U.S. Patent No. 5,815,218 ("Defendants' Summary Judgment Motion ('218 Patent)") [Docket No. 381];

10

11 5) Motion of Daewoo Electronics Corporation and Daewoo Electronics America, Inc., for Partial Summary Judgment on U.S. Patent No. RE 37,332 ("Defendants' Summary Judgment Motion ('332 Patent)") [Docket No. 382];

12

13 6) Motion of Daewoo Electronics Corporation and Daewoo Electronics America, Inc., for Partial Summary Judgment on U.S. Patent No. 6,064,538 ("Defendants' Summary Judgment Motion ('538 Patent)") [Docket No. 383];

14

15 7) Plaintiff's Motion for Summary Judgment on U.S. Patent No. 6,421,210 ("Plaintiff's Summary Judgment Motion ('210 Patent)") [Docket No. 385]; and

16 8) Motion for Summary Judgment of Infringement and Validity on U.S. Patent No. RE 37,332 ("Plaintiff's Summary Judgment Motion ('332 Patent)") [Docket No. 390].

17

18 **II. LEGAL STANDARDS ON SUMMARY JUDGMENT**

19 Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories,

20 and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

21 any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ.

22 P. 56(c). In order to prevail, a party moving for summary judgment must show the absence of a

23 genuine issue of material fact with respect to an essential element of the non-moving party's claim,

24 or to a defense on which the non-moving party will bear the burden of persuasion at trial. *Celotex*

25 *Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Further, "*Celotex* requires that for issues on which the

26 movant would bear the burden of proof at trial, that party must show affirmatively the absence of a

27 genuine issue of material fact," that is, "that, on all the essential elements of its case on which it

28 bears the burden of proof at trial, no reasonable jury could find for the non-moving party."

United States District Court
For the Northern District of California

1 *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir.1993). Once the movant has made this

2 showing, the burden then shifts to the party opposing summary judgment to designate "specific facts

3 showing there is a genuine issue for trial." *Id.* at 323. On summary judgment, the court draws all

4 reasonable factual inferences in favor of the non-movant. *Anderson v. Liberty Lobby Inc.*, 477 U.S.

5 242, 255 (1986).

6 **III.    LEGAL STANDARDS ON INFRINGEMENT**

7 A determination of infringement is a two-step process. *Wright Med. Tech., Inc. v. Osteonics*

8 *Corp.*, 122 F.3d 1440, 1443 (Fed. Cir. 1997). The first step is claim construction, which is a

9 question of law to be determined by the court. *Id.* The second step is an analysis of infringement, in

10 which it must be determined whether a particular device infringes a properly construed claim. *Id.*

11 This analysis is a question of fact. *Id.* A device literally infringes if each of the elements of the

12 asserted claims is found in the accused device. *Id.* In the alternative, a device may infringe under

13 the doctrine of equivalents "if every limitation of the asserted claim, or its 'equivalent,' is found in

14 the accused subject matter, where an 'equivalent' differs from the claimed limitation only

15 insubstantially." *Ethicon Endo-Surgery, Inc. v. United States Surgical Corp.*, 149 F.3d 1309, 1315

16 (Fed. Cir. 1998).

17 In determining equivalence, Courts often consider "[w]hether a component in the accused

18 subject matter performs substantially the same function as the claimed limitation in substantially the

19 same way to achieve substantially the same result." *Id.* However, "'[e]quivalence . . . is not the

20 prisoner of a formula and is not an absolute to be considered in a vacuum.'" *Warner-Jenkinson Co.*

21 *v. Hilton Davis Chem. Co.*, 520 U.S. 17, 24-25 (1997) (quoting *Graver Tank & Mfg. Co. v. Linde Air*

22 *Prods. Co.*, 339 U.S. 605, 609 (1950)). In *Graver Tank*, the Court described the equivalence inquiry

23 as follows:

24 > What constitutes equivalency must be determined against the context
25 > of the patent, the prior art, and the particular circumstances of the
> case. . . . In determining equivalents, things equal to the same thing
> may not be equal to each other and, by the same token, things for most
26 > purposes different may sometimes be equivalents. Consideration must
> be given to the purpose for which an ingredient is used in a patent, the
27 > qualities it has when combined with the other ingredients, and the
> function which it is intended to perform. An important factor is
28 > whether persons reasonably skilled in the art would have known of the

3

interchangeability of an ingredient not contained in the patent with one that was.

*Id.* (quoting *Graver Tank*, 339 U.S. at 609).

The doctrine of equivalents may not be applied where it would "erase 'meaningful structural and functional limitations of the claim on which the public is entitled to rely in avoiding infringement.'" *Conopco, Inc. v. May Dep't Stores Co.*, 46 F.3d 1556, 1562 (Fed. Cir. 1994) (quoting *Pennwalt Corp. v. Durand-Wayland, Inc.*, 833 F.2d 931, 935 (Fed. Cir. 1987)); *see also Lockheed Martin Corp. v. Space Sys./Loral, Inc.*, 324 F.3d 1308, 1320 (Fed. Cir. 2003) (holding that "if a court determines that a finding of infringement under the doctrine of equivalents 'would entirely vitiate a particular claim[ed] element,' then the court should rule that there is no infringement under the doctrine of equivalents") (quoting *Bell Atlantic Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1280 (Fed. Cir. 2001)). Failure to meet a claim limitation, by itself, is not necessarily enough to "erase" or "vitiate" that claim element. *Ethicon*, 149 F.3d at 1317. As the *Ethicon* court noted, "any analysis of infringement under the doctrine of equivalents *necessarily* deals with subject matter that is 'beyond,' 'ignored' by, and not included in the literal scope of a claim." *Id.* Thus, the relevant inquiry is whether the subject matter is "specifically excluded" from coverage such that its inclusion under the doctrine of equivalents is "somehow inconsistent with the language of the claim." *Id.*

Application of the doctrine of equivalents also may be limited as a result of the prosecution history of the patent. In particular, "a narrowing amendment made [during patent prosecution] to satisfy any requirement of the Patent Act may give rise to an estoppel." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.* 535 U.S. 722, 736 (2002). "A patentee who narrows a claim as a condition for obtaining a patent disavows his claim to the broader subject matter, whether the amendment was made to avoid the prior art or to comply with § 112." *Id.* at 737. Thus, where a narrowing amendment was adopted during prosecution to secure allowance of a claim, a presumption of estoppel arises. *Id.* The burden of production and persuasion then shifts to the patentee to rebut that presumption by showing that the particular equivalent was not disclaimed. *Id.*

4

1     The *Festo* presumption may be rebutted in three ways. *Id.* The patentee may demonstrate
2 that: 1) the equivalent would have been unforeseeable at the time of the amendment; 2) "the rationale
3 underlying the amendment [bears] no more than a tangential relation to the equivalent in question;"
4 or 3) "there [is] some other reason suggesting that the patentee could not reasonably be expected to
5 have described the insubstantial substitute in question." *Id.* at 740-41. Subsequently, the Federal
6 Circuit explained that "the 'some other reason route' is a narrow one" and offered "shortcomings of
7 language" as an example. *Amgen, Inc. v. Hoechst Marion Roussel*, 457 F.3d 1293, 1313 (Fed. Cir.
8 2006) (citing *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 344 F.3d 1359, 1366 (Fed. Cir.
9 2003)). The Federal Circuit cautioned that "the other reason must be such that the patentee could
10 'not reasonably be expected' to write a claim to encompass the equivalent." *Id.* at 1316 (citing *Festo*
11 *Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.,* 535 U.S. at 741).

12 **IV.    LEGAL STANDARDS GOVERNING CLAIM CONSTRUCTION**

13     "It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to
14 which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312
15 (Fed. Cir. 2005) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d
16 1111, 1115 (Fed. Cir. 2004)). Generally, claim terms are given the ordinary and customary meaning
17 that would be ascribed to them by a person of ordinary skill in the field of the invention. *Id.* at 1313.
18 The most "significant source of the legally operative meaning of disputed claim language" is the
19 intrinsic evidence of record, that is, the claims, the specification and the prosecution history.
20 *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). This is because "the
21 person of ordinary skill in the art is deemed to read the claim term not only in the context of the
22 particular claim in which the disputed term appears, but in the context of the entire patent, including
23 the specification." *Phillips*, 415 F.3d at 1312. In some cases, the specification may reveal a "special
24 definition" given by the inventor that differs from the meaning the term might otherwise possess. *Id.*
25 at 1316. A specification may also reveal "an intentional disclaimer, or disavowal, of claim scope by
26 the inventor." *Id.* A person of ordinary skill in the art also looks to the prosecution history of a
27 patent to understand how the patent applicant and the Patent Office understood the claim terms. *Id.*
28 at 1313, 1317.

5

1       "[U]nless compelled to do otherwise, a court will give a claim term the full range of its

2 ordinary meaning as understood by an artisan of ordinary skill." *Rexnord Corp. v. Laitram Corp.*,

3 274 F.3d 1336, 1342 (Fed. Cir. 2001) (holding that district court erred in giving claim language

4 narrow interpretation rather than broader interpretation that was also supported by claim language on

5 the basis that narrow interpretation was consistent with preferred embodiments). Thus, while claims

6 are to be construed in light of the specification, courts must be careful not to read limitations from

7 the specification into the claim. *Phillips*, 415 F.3d at 1323. If a patent specification describes only a

8 single embodiment, that does not mean the claims of the patent necessarily must be construed as

9 limited to that embodiment. *Id.* Rather, it is to be understood that the purpose of the specification

10 "is to teach and enable those of skill in the art to make and use the invention" and that sometimes,

11 the best way to do that is to provide an example. *Id.* In *Phillips*, the Federal Circuit acknowledged,

12 "the distinction between using the specification to interpret the meaning of a claim and importing

13 limitations from the specification can be a difficult one to apply in practice." *Id.*

14       Courts may also use extrinsic evidence in construing claim terms if it is necessary, so long as

15 such evidence is not used to "vary or contradict the terms of the claims." *Markman,* 52 F.3d at 980.

16 The Federal Circuit has warned, however, that such evidence is generally "less reliable than the

17 patent and its prosecution history." *Phillips*, 415 F.3d at 1318. Courts may consider expert

18 testimony, the testimony of the inventor, and prior art, whether or not it is referenced in the

19 specification or prosecution history. *Vitronics*, 90 F.3d at 1584. Courts are also free to consult

20 dictionaries and technical treatises so long as they are careful not to elevate them "to such

21 prominence that it focuses the inquiry on the abstract meaning of the words rather than on the

22 meaning of the claim terms within the context of the patent." *Phillips*, 415 F.3d at 1321-22. As the

23 court explained in *Markman*, "[extrinsic] evidence may be helpful to explain scientific principles, the

24 meaning of technical terms, and terms of art that appear in the patent and prosecution history." 52

25 F.3d at 980.

26       Where a claim is fairly susceptible of two constructions, courts should attempt to preserve

27 their validity, reading the claims in light of the specification. *See Process Control Corp. v.*

28 *HydReclaim Corp.*, 190 F.3d 1350, 1357 (Fed. Cir. 1999). However, courts may not redraft claims

6

**United States District Court**
For the Northern District of California

1 to change their ordinary meaning, even if the ordinary meaning produces a nonsensical result. *Id.*

2 Clerical errors in the claims may be corrected by a district court only if "1) the correction is not

3 subject to reasonable debate based on consideration of the claim language and the specification and

4 2) the prosecution history does not suggest a different interpretation of the claims." *Novo Indus.,*

5 *L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1354 (Fed. Cir. 2003).

## V.    LEGAL STANDARDS ON INVALIDITY

7      "Because a patent is presumed to be valid, 35 U.S.C. § 282, the evidentiary burden to show

8 facts supporting a conclusion of invalidity, which rests on the accused infringer, is one of clear and

9 convincing evidence." *Takeda Chem. Indus., Inc. v. Alphapharm Pty., Ltd.*, 492 F.3d 1350, 1355

10 (Fed. Cir. 2007) (affirming district court's finding that defendant had not proved obviousness by

11 clear and convincing evidence).[2]  A patent may be invalid because the invention is not literally new

12 (in which case, it may be anticipated) or because, although the invention is literally new, it is an

13 obvious variation or modification of old products, processes, and technology. *See* Donald S.

14 Chisum, *Sources of Prior Art in Patent Law*, 52 Wash. L. Rev. 1, 2 (1976). The standards governing

15 these two doctrines are set forth below.

---

18    [2] Daewoo suggests that the "clear and convincing" standard may no longer apply to the
19 obviousness inquiry, at least where prior art was not disclosed to the Patent Office. *See* Defendants'
Supplemental Brief on Obviousness re Motions for Summary Judgment ("Daewoo Supp. Brief") at 3.
20 In support of this position, Daewoo points to the following language in the Supreme Court's recent
decision in *KSR Int'l, Co. v. Teleflex, Inc.*:

22         We need not reach the question whether the failure to disclose [the prior
art] during the prosecution of [the asserted patent] voids the presumption
of validity given to issued patents, for claim 4 is obvious despite the
23         presumption. We nevertheless think it appropriate to note that the
rationale underlying the presumption – that the PTO, in its expertise, has
24         approved the claim – seems much diminished here.

25 *Id.* (quoting – U.S. – , 127 S. Ct. 1727, 1745 (2007)). Notwithstanding the dicta in *KSR*, the statutory
presumption of validity has not been altered by Congress. Furthermore, the Federal Circuit has
26 continued to apply the "clear and convincing" standard to the question of invalidity without qualification
in the wake of *KSR*. *See, e.g., PharmaStem Therapeutics v. ViaCell, Inc.*, 491 F.3d 1342, 1360 (Fed.
27 Cir. 2007) (holding that "clear and convincing" standard applied to invalidity challenge based on
obviousness). Therefore, the Court concludes that the "clear and convincing" standard continues to
28 apply to invalidity challenges following *KSR*.

**United States District Court**
For the Northern District of California

1
## A. Anticipation

2    A patent is anticipated under 35 U.S.C. § 102 if "(a) the invention was known or used by

3    others in this country, or patented or described in a printed publication in this or a foreign country,

4    before the invention thereof by the applicant for patent, or (b) the invention was patented or

5    described in a printed publication in this or a foreign country or in public use or on sale in this

6    country, more than one year prior to the date of the application for patent in the United States . . . ."

7    In order for prior art to be "known" under § 102(a), it must be publically accessible and it

8    must be sufficient to enable one with ordinary skill in the art to practice the invention. *Minnesota*

9    *Mining & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1301 (Fed. Cir. 2002). "Public use under 35

10   U.S.C. § 102(b) includes any use of the claimed invention by a person other than the inventor who is

11   under no limitation, restriction or obligation of frequency." *Id.* Alternatively, a patent may be

12   invalid under the "on-sale-bar" codified in § 102(b) if there was a "definite sale or offer to sell more

13   than one year before the application for the patent and . . . the product sold or offered for sale

14   anticipated the claimed invention or rendered it obvious." *Id.* The on-sale-bar is usually triggered by

15   the actions of the inventor. *See* Chisum, *Sources of Prior Art in Patent Law*, 52 Wash. L. Rev. at 7.

16   As Chisum notes, "most things 'in public use or on sale' within the meaning of Section 102(b)

17   would also be 'known or used' within the meaning of Section 102(a)." *Id.*

18   In order to establish anticipation under § 102(a) on the basis of a printed publication, a

19   defendant must demonstrate in the publication "each and every limitation of the claimed invention."

20   *Novo Nordisk Pharms., Inc. v. Bio-Techn. Gen. Corp.*, 424 F.3d 1327, 1354 (Fed. Cir. 2005). Thus,

21   "each and every limitation [must be] found either expressly or inherently in a single prior art

22   reference." *Oakley Inc. v. Sunglass Hut Int'l*, 316 F.3d 1331, 1339 (Fed. Cir. 2003) (quotations

23   omitted). A limitation is "inherent" if it is "necessarily present" in the prior art invention.

24   *SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1343 (Fed. Cir. 2005).

25   Similarly, under § 102(b), a device that is used in public or sold may render a patent invalid

26   on the basis of anticipation only if the device includes every limitation of the later claimed invention.

27   *See Netscape Commc'ns Corp. v. Konrad*, 295 F.3d 1315, 1321 (Fed. Cir. 2002).

28

8

1    Whether a patent is anticipated under § 102 is a question of fact. *Schumer v. Lab. Computer*

2  *Sys., Inc.*, 308 F.3d 1304, 1315 (Fed. Cir. 2002) (holding that district court erred in holding on

3  summary judgment that device that was in "public use" under § 102(b) because evidence was

4  insufficient to establish as a matter of law that every limitation was included in earlier device). In

5  *Schumer*, the Federal Circuit cautioned that the burden on summary judgment for a party to establish

6  invalidity based on anticipation is high:

7        Typically, testimony concerning anticipation must be testimony from
         one skilled in the art and must identify each claim element, state the
8        witnesses' interpretation of the claim element, and explain in detail
         how each claim element is disclosed in the prior art reference. The
9        testimony is insufficient if it is merely conclusory. . . . And if the
         testimony relates to prior invention and is from an interested party, as
10       here, it must be corroborated. *Sandt Tech., Ltd. v. Resco Metal &*
         *Plastics Corp.*, 264 F.3d 1344, 1350, 60 USPQ2d 1091, 1094
11       (Fed.Cir.2001); *see also Singh v. Brake*, 222 F.3d 1362, 1367, 55
         USPQ2d 1673, 1676 (Fed.Cir.2000) (recognizing the "concern that a
12       party claiming inventorship might be tempted to describe his actions in
         an unjustifiably self-serving manner in order to obtain a patent or to
13       maintain an existing patent").

14       It is not our task, nor is it the task of the district court, to attempt to
         interpret confusing or general testimony to determine whether a case of
15       invalidity has been made out, particularly at the summary judgment
         stage. Indeed, to accept confusing or generalized testimony as evidence
16       of invalidity is improper. The risk is great that the confusion or
         generality is the result, not of an inarticulate witness or complex
17       subject matter, but of a witness who is unable to provide the essential
         testimony.

18

19  *Id.* at 1315-16.

20      **B.    Obviousness**

21      The standard regarding obviousness is set forth in 35 U.S.C. § 103(a), which provides, in

22  relevant part, as follows:

23       A patent may not be obtained though the invention is not identically
         disclosed or described as set forth in section 102 of this title, if the
24       differences between the subject matter sought to be patented and the
         prior art are such that the subject matter as a whole would have been
25       obvious at the time the invention was made to a person having
         ordinary skill in the art to which said subject matter pertains.

26

27  35 U.S.C. § 103(a). Although § 103 does not expressly define "prior art" for the purposes of that

28  section, the reference in it to § 102 supports the conclusion that what is considered to be prior art for

9

the purposes of § 102 is also prior art under § 103. *See* Chisum, *Sources of Prior Art in Patent Law*, 52 Wash. L. Rev. at 4.

In *Graham v. John Deere Co.*, the Supreme Court instructed courts to address the question of obviousness against the "background" of three inquiries: 1) the scope and content of the prior art; 2) differences between the prior art and the claims at issue; and 3) the level of ordinary skill in the pertinent art. 383 U.S. 1, 17 (1966). In addition, under *Graham* courts are to consider "secondary considerations" that may be relevant to obviousness, such as "commercial success" and "long felt but unsolved needs." *Id.*

In *Great Atl. & Pac. Tea Co. v. Supermarket Equip.*, the Court explained the policy on which the nonobviousness requirement is based:

> The function of a patent is to add to the sum of useful knowledge. Patents cannot be sustained when, on the contrary, their effect is to subtract from former resources freely available to skilled artisans. A patent for a combination which only unites old elements with no change in their respective functions . . . obviously withdraws what already is known into the field of its monopoly and diminishes the resources available to skillful men.

340 U.S. 147, 152-53 (1952). On the other hand, "a patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." *KSR*, 127 S. Ct. at 1741. For example, "when the prior art teaches away from combining certain known elements, discovery of a successful means of combining them is more likely to be nonobvious." *Id.* at 1740; *see also McGinley*, 262 F.3d at 1354. It may also be "helpful" to ask whether there was a "teaching, suggestion, or motivation to combine known elements" that would have rendered an invention obvious ("the TSM test"). *KSR*, 127 S. Ct. at 1741.

In *KSR*, the Supreme Court decided that the Federal Circuit had applied the TSM test too rigidly by holding that the patent examiner should look only to the question the patentee was trying to resolve in determining whether there was a motivation to combine elements found in prior art. *Id.* at 1742. The Court explained, "[t]he question is not whether the combination was obvious to the patentee but whether the combination was obvious to a person with ordinary skill in the art." *Id.* Therefore, "any need or problem known in the field of the endeavor at the time of the invention and addressed by the patent can provide a reason for combining the elements in the manner claimed." *Id.*

10

1    While the ultimate conclusion of obviousness is a legal question, it is based upon underlying

2 facts. *In re Icon Health & Fitness*, 2007 WL 2189161 *2 (Aug. 1, 2007). "Underlying facts include

3 the scope and content of the prior art, the level of ordinary skill in the art at the time of the invention,

4 objective evidence of nonobviousness, and differences between the prior art and the claimed subject

5 matter." *Id.* (citing *Graham*, 383 U.S. at 17-18). The presence or absence of a motivation to

6 combine is also a question of fact, *see In re Gartside*, 203 F.3d 1305, as are the "secondary

7 considerations" discussed in *Graham*. *See PharmaStem Therapeutics*, 491 F.3d at 1359.

8    **VI.    THE '018 PATENT**

9       **A.    Background**

10   The '018 patent is entitled "Loading Mechanism for a Video Cassette" and "discloses a

11 mechanical subsystem for a VCR that performs loading and eject operations – that is, the subsystem

12 opens and closes the door of a VCR, and moves the unit's cassette holder to and from the operating

13 position." December 20, 2006 Summary Judgment Order at 1-2. As the court explained in a

14 previous order, "[m]echanisms known in the prior art first moved the cassette holder toward the back

15 of the unit until it cleared the area swept by the door, and then moved it downward into the play

16 position." *Id.* at 2. In contrast, in the '018 invention, "the cassette holder moves into the unit but

17 begins its downward motion into the play position before clearing the door." *Id.* As a result of this

18 innovation, the depth of the video cassette deck can be reduced, allowing for an overall reduction in

19 size of the VCR unit. *Id.*

20      **B.    The Court's December 20, 2006 Summary Judgment Order**

21   Following claim construction, Daewoo filed a motion for summary judgment regarding the

22 '018 patent. In its motion, Daewoo argued, *inter alia*, that the '018 patent was invalid under 35

23 U.S.C. § 103(a) because it was obvious in light of prior art. In particular, Daewoo argued that the

24 patent was obvious in light of Japanese Patent Publication No. H06-243561 (the "561-J patent"), in

25 combination with either Japanese Patent Publication No. H05-314606 (the "606-J patent") or

26 Japanese Patent H07-72967 (the "967-J patent"). The court disagreed.

27   In its summary judgment order, the court concluded that the '018 patent was not obvious for

28 several reasons. First, the court concluded that the 561-J patent "teaches directly away from the

11

United States District Court
For the Northern District of California

1 claimed elements of the '018 patent" because, rather than teaching a mechanism in which the motion
2 of the door can precede the vertical motion of the cassette in the eject sequence, the 561-J patent
3 teaches a mechanism in which "the descent of the holder must coincide with the door being finally
4 closed." December 20, 2006 Summary Judgment Order at 9. Conversely, "in the eject sequence, the
5 start of the ascent of the holder marks the time point at which the door may begin to open." *Id*.
6 Because "[a]pplying the idea of the 606-J or 967-J patents to open the door before raising the
7 cassette holder during an eject sequence is directly contrary to the teaching of the 561-J patent . . .
8 the teachings of these patents do not suggest their combination." *Id*.

9 Second, the court found that "the combination of either the 606-J or the 967-J patents with
10 the 561-J patent would render the 561-J patent inoperative for its intended purpose." *Id*. As a result,
11 the court concluded, Daewoo did not make a prima facie case of obviousness. *Id*. (citing *McGinley*
12 *v. Franklin Sports, Inc.*, 262 F.3d 1339, 1354 (Fed. Cir. 2001) for the proposition that "a prima facie
13 case of obviousness does not exist if combining references would produce a seemingly inoperative
14 device").

15 Third, the court concluded that the 561-J patent (and, by implication, the 606-J patent and the
16 967-J as well) does not disclose one of the elements of the '018 invention, "a slide arm for separately
17 actuating a holder drive gear and a door arm." *Id*. Rather, the slide arm disclosed in the 561-J patent
18 does not do "anything more than interact with an assembly of gears, resulting in the simultaneous
19 motion of a holder drive gear and a door arm." *Id*. As a result, the court concluded that a prima
20 facie case of obviousness was not made because not all of the elements of the asserted '018 claims
21 were present in the prior art. *Id*.

22 For the reasons set forth above, the court denied Daewoo's request for summary judgment on
23 the basis of obviousness, finding that Daewoo had not established by clear and convincing evidence
24 that the patent was invalid on this basis.

25 **C. Plaintiff's Motion for Partial Summary Judgment**

26 Notwithstanding the court's holding in the December 20, 2006 Summary Judgment Order,
27 Daewoo continues to take the position that the same three patents – the 561-J, 606-J and 967-J
28 patents – render the '018 patent obvious. In the instant motion, Funai seeks summary judgment that

12

1  the '018 patent is *not* invalid on the basis of obviousness, asserting that the court's previous holding
2  is now the law of the case and therefore, Daewoo cannot to proceed to trial on this issue.

3        Daewoo counters that the court's denial of its request for summary judgment on the question
4  of obviousness does not compel the conclusion that Funai is entitled to summary judgment on the
5  same issue. First, it points out that in addressing Daewoo's summary judgment motion, the court
6  was required to draw all inferences with respect to factual disputes in favor of Funai, as the opposing
7  party, whereas the summary judgment standard now favors Daewoo. Second, Daewoo asserts that
8  the Court should revisit its arguments on obviousness because it now has additional expert testimony
9  that was not submitted in connection with the earlier motion on the same issue. Finally, Daewoo
10 asserts that the Court should reconsider the earlier ruling because the law on obviousness has
11 changed as a result of the Supreme Court's recent decision, *KSR v. Teleflex Inc.*, – U.S. – , 127 S. Ct.
12 1727 (2007).

13     **D.    Law of the Case Doctrine**

14     Under the law of the case doctrine, a court is generally precluded from revisiting an issue that
15 has already been decided – either "explicitly or by necessary implication" – by the same court.
16 *Milgard Tempering, Inc. v. Selas Corp. of Am.*, 902 F.2d 703, 715 (9th Cir. 1990). However, courts
17 have limited discretion to make exceptions to this rule on one or more of the following grounds:
18 "(1) the first decision was clearly erroneous; (2) an intervening change in the law has occurred; (3)
19 the evidence on remand is substantially different; (4) other changed circumstances exist; (5) a
20 manifest injustice would otherwise result." *Thomas v. Bible*, 983 F.2d 152, 155 (9th Cir. 1993).

21     Daewoo asserts that the law of the case does not apply here because the court's previous
22 decision was based on a different standard, apparently suggesting that the issue decided in the
23 December 2006 Summary Judgment Order is, therefore, not the same as the issue raised here. Even
24 if it is the same issue, Daewoo argues, the court's previous decision on the question of obviousness
25 is not binding because two of the exceptions listed above apply: 1) there has been an intervening
26 change in the law; and 2) the evidence is substantially different. The court rejects Daewoo's
27 arguments.

28

United States District Court
For the Northern District of California

1

### 1.    Issue Decided

2    Daewoo argues that the court is not bound by its previous decision regarding obviousness
3    because the inferences were drawn in Funai's favor on Daewoo's summary judgment motion
4    whereas the inferences are drawn in Daewoo's favor on the instant motion. Daewoo's argument has
5    no merit. On summary judgment, courts are required to "view the *facts* in the light most favorable to
6    the non-moving party and draw reasonable inferences in favor of that party." *See Scheuring v.*
7    *Traylor Bros., Inc.,* 476 F.3d 781, 784 (9th cir. 2007) (emphasis added) (citing *Anderson v. Liberty*
8    *Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, as the court noted in its December 20, 2006
9    Summary Judgment Order, obviousness is a legal question where the relevant underlying facts are
10    not in dispute. December 20, 2006 Summary Judgment Order at 3 (citing *Iron Grip Barbell Co. v.*
11    *USA Sports, Inc.*, 392 F.3d 1317, 1323 (Fed. Cir. 2004)).

12    Here, the facts relating to the question of obviousness were and still are undisputed, as
13    Daewoo itself concedes in its brief. *See* Opposition at 9 ("Obviousness is a legal question where, as
14    here, the relevant underlying facts are undisputed"). Therefore, the "opposite inferences" that apply
15    to the two summary judgment motions have no bearing on the legal question regarding obviousness
16    at issue here. Rather, the court has already decided, as a matter of law, that the '018 patent is not
17    obvious in light of the prior art cited by Daewoo. The court may only revisit that issue if one of the
18    exceptions to the law of the case doctrine applies.

19

### 2.    Substantially Different Evidence

20    Following the court's December 20, 2006 Summary Judgment Order, Daewoo obtained an
21    expert report from Dr. James Rice, on which Daewoo now relies in support of its assertion that the
22    '018 patent is invalid on the basis of obviousness. *See* Declaration of Archana R. Ojha in Support of
23    Plaintiff's Motions for Summary Judgment ("Ojha Motions Decl."), Ex. I. This new expert report
24    does not constitute "substantially new evidence." First, Dr. Rice's report largely repeats arguments
25    that the court had already rejected in its summary judgment order. Second, Dr. Rice relies on the
26    same evidence that the court relied upon in its December 20, 2006 decision – the three patents that
27    allegedly rendered the '018 patent obvious – in support of his opinions. Therefore, the new evidence

28

**United States District Court**
For the Northern District of California

14

1   and deposition testimony by Dr. Rice do not justify a departure from the normal rule that the court
2   will not revisit issues that have already been decided.

3   ### 3.   Intervening Change in the Law

4       Daewoo argues that the court's conclusions regarding obviousness are no longer valid in light
5   of the Supreme Court's recent decision in *KSR*, which addressed the standard to be applied in
6   determining whether a patent is obvious. The court disagrees: while *KSR* modified the standard with
7   respect to obviousness in some respects, it did not affect the principles upon which the court's
8   finding of nonobviousness was based in the December 20, 2006 Summary Judgment Order.

9       The court held in the December 20, 2006 Summary Judgment Order that Daewoo did not
10  make even a threshold showing that all of the elements of the '018 invention were to be found in the
11  identified prior art – a basic requirement for obviousness that was not questioned by the Court in
12  *KSR*. Further, the court held that the prior art did not render the '018 invention obvious because it
13  taught away from combining the various known elements. In reaching this conclusion, the court
14  relied on the well-established principle – referred to with approval in *KSR* – that where prior art
15  teaches away from combining the known elements, an invention is less likely to be obvious. *See*
16  *KSR*, 127 S. Ct. at 1740. Nor did *KSR* alter the related rule that "a reference may teach away from a
17  use when that use would render the result inoperable." *See In re Icon Health & Fitness, Inc.*, 2007
18  WL 2189161 *5 (Fed. Cir. August 1, 2007). Indeed, the Federal Circuit in *Icon Health & Fitness*,
19  which was decided after *KSR*, cited to the same case as this court relied on in its summary judgment
20  order, *McGinley v. Franklin Sports, Inc.*, 262 F.3d 1339, 1354 (Fed. Cir. 2001).

21      In short, *KSR* has no impact on the court's ruling on obviousness in its December 20, 2006
22  Summary Judgment Order. To the contrary, that order is entirely consistent with the standards that
23  govern obviousness in the wake of the Supreme Court's decision in *KSR*.

24  ### E.   Conclusion

25      For the reasons stated above, Plaintiff's Summary Judgment Motion ('018 Patent) is
26  GRANTED.

27

28

15

United States District Court
For the Northern District of California

1  **VII.   THE '209 PATENT**

2     **A.    Background**

3     The '209 patent is entitled "Video Signal Receiver in Which a Reference Signal is Shared by

4  a PLL Circuit Which Sets the Output Frequency of a Local RF-IF Oscillator and by the Chrominance

5  Signal Generator" and was issued November 16, 1999, from an application filed August 3, 1995,

6  claiming priority from four Japanese patent applications filed between August 4, 1994, and March 6,

7  1995. In the Claim Construction Order, the court explained that the invention disclosed in the '209

8  patent "reduces the cost of the video signal processor in a VCR by using an expensive component

9  called the crystal oscillator to perform two functions: 1) to process color information in the TV

10  signal and 2) to generate RF signals for the TV antenna input." Claim Construction Order at 3-4.

11  The court further noted that "[t]his departs from the prior art which formerly required a crystal

12  oscillator to perform each function." *Id.* at 4.

13     The '209 patent has 5 claims, with claims 2-5 dependent on claim 1. Claim 1 provides as

14  follows:

15          1.     A video signal receiver comprising:

16          a mixer circuit arranged to receive an RF signal from an RF amplifier
            circuit and convert the RF signal to an IF signal based on a local
17          oscillation signal from a local oscillation circuit;

18          a PLL circuit for setting an output frequency of said local oscillation
            circuit to a frequency corresponding to a receiving frequency by
19          making a phase comparison between the local oscillation signal and a
            first reference signal; and

20
            a chrominance signal circuit, provided with a single crystal unit, for
21          generating a second reference signal by controlling oscillation of said
            crystal unit to generate a chrominance signal based on the IF signal
22          from said mixer circuit by using the second reference signal,

23          wherein the second reference signal generated based on said crystal
            unit of said chrominance signal circuit is also supplied to said PLL
24          circuit as the first reference signal.

25  In the Claim Construction Order, the court construed the term "chrominance signal circuit" as "a

26  circuit for generating a signal containing color information." Claim Construction Order at 31.

27     Funai asserts that certain Daewoo products manufactured before June 2004 containing US5

28  version tuners infringe the '209 patent. Although Funai stated in its preliminary infringement

16

**United States District Court**
For the Northern District of California

1  contentions that Daewoo's products infringe all 5 claims of the '209 patent, *see* Declaration of

2  Daniel M. Press in Support of Motion for Partial Summary Judgment on U.S. Patent No. 5,987,209

3  ("Press '209 Motion Decl."), Ex. 2 (Funai Preliminary Infringement Contentions) at 2, Funai stated

4  in its Opposition to the instant motion, and stipulated at oral argument, that claim 1 is no longer

5  being asserted. *See* Funai '209 Opposition at 18 ("[t]herefore, claim 1, which is no longer asserted,

6  is not obvious . . . ").

### B. Issues Raised in Daewoo's Summary Judgment Motion

8  Daewoo asserts that it is entitled to summary judgment both of non-infringement and

9  invalidity as to the '209 patent. With respect to infringement, Daewoo asserts that in the accused

10  products, the limitations of claim 1, and therefore all the remaining claims, are not met because:

11  1) the first and second reference signals are not the same because the first reference signal is the

12  *divided* output of the crystal oscillator; and 2) the reference signal applied to the chrominance signal

13  circuit to generate the chrominance signal is the 1H phase delayed video signal from the charge

14  coupled device ("CCD"), which is not based on the output of the crystal oscillator (which produces a

15  3.58 MHz signal); and 3) the chrominance signal circuit does not generate a chrominance signal

16  "based on the IF signal" because the IF signal from the tuner mixer circuit is demodulated in the IF

17  demodulator chip, producing a baseband video signal, and it is based on this baseband signal (rather

18  than the IF signal) that the chrominance signal is generated. Daewoo further asserts that the

19  additional limitation in claim 5 requiring a detector between the mixer circuit and the chrominance

20  signal circuit is not met.

21  In addition, Daewoo argues that it does not infringe the '209 patent under the doctrine of

22  equivalents. First, Daewoo points out that the applicants amended claim 1 by adding the requirement

23  that the same reference signal must be used by the chrominance signal circuit and the tuner PLL in

24  order to overcome prior art. Therefore, Daewoo asserts, the doctrine of prosecution history estoppel

25  bars Funai from relying on the doctrine of equivalents with respect to this limitation. Second,

26  Daewoo argues that the accused VCRs do not process chrominance in the way described in the '209

27  patent.

28

United States District Court
For the Northern District of California

17

1    With respect to invalidity, Daewoo argues that the '209 patent is obvious in light of prior art,

2 pointing to United States Patent No. 4,051,515 ("the '515 patent"), which was considered by the

3 examiner, and to an article by Eric Breeze published in 1974. In particular, according to Daewoo,

4 the examiner allowed the '209 patent to issue on the basis that the '515 patent did not disclose the

5 use of a common reference signal for the chrominance signal and the PLL circuit, even though the

6 '515 patent disclosed all of the other limitations of the '209 patent. Yet the Breeze article, which

7 was not considered by the examiner, Daewoo asserts, did suggest this combination. Daewoo further

8 asserts that Breeze disclosed the additional limitations contained in claims 2-5.

9    Funai rejects Daewoo's infringement arguments, asserting that they rest on misinterpretation

10 of the '209 patent and the court's claim construction. First, Funai asserts that Daewoo's argument

11 that the first and second reference signal are not the same because the first reference signal is the

12 divided output of the crystal oscillator is premised on the incorrect assumption that the frequency

13 divider is separate and apart from the PLL circuit. In fact, Funai argues, the frequency divider should

14 properly be considered part of the PLL circuit. Similarly, as to the argument that the signal received

15 by the chrominance signal circuit is not based on the output of the crystal oscillator, but rather is the

16 1H phase delayed video signal from the CCD, Funai asserts that Daewoo improperly excludes the

17 CCD from the chrominance signal circuit. According to Funai, both of these issues turn on claim

18 construction. Funai does not address in its brief Daewoo's third argument, that the chrominance

19 signal circuit does not generate a chrominance signal based on the IF signal. Finally, with respect to

20 Daewoo's argument that prosecution history estoppel bars Funai from arguing the accused devices

21 infringe under the doctrine of equivalents, at least as to the requirement that the same reference

22 signal must be used by the chrominance signal circuit and the tuner PLL, Funai implicitly concedes

23 this point. In particular, Funai's only response to this argument is the statement, "[e]ven if Dawoo

24 were correct in this assertion as to claim 1, they cannot claim that Funai is barred by prosecution

25 history estoppel on claim 2's further *structural* limitation since originally filed claim 12 (which

26 issued as claim 2) was never narrowed by amendment." Opposition at 15 (emphasis in original).

27    In its Reply brief, Daewoo argues that at the time the '209 patent was filed, the CCD was not

28 considered to be part of the chrominance signal circuit, asserting that "[n]one of the Funai service

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  manuals, DECL service manuals, or third party service manuals produced in this litigation from that
2  time or earlier contained a CCD section on the video processing chip; rather, as in the DECL Service
3  Manual for the DV-F462N, dated March 1996, at page 26 . . . there is a separate 'CCD Processor'
4  IC, separate from the 'Y/C Processor' IC." Daewoo '209 Reply at 3. Daewoo further points to the
5  prosecution history of the '209 patent, during which the examiner found that original claim 1, which
6  used a CCD delay to separate luminance and chrominance, disclosed a different invention than was
7  disclosed in application claims 11-15. The latter claims, according to Daewoo, process chrominance
8  by using the 3.58 MHz reference directly to demodulate the chrominance signal. The applicant
9  chose to proceed with claims 11-15. Daewoo further argues in the Reply that the section of the '209
10  patent cited by Funai as evidence that the CCD delay circuit is part of the chrominance circuit – col.
11  4:42-50 – described the first embodiment of the originally claimed invention, that is, the embodiment
12  that was subsequently abandoned as a separate invention.

13  ### C. Analysis

14  #### 1. PLL Circuitry (Claim 1)

15  Daewoo asserts that its products don't infringe the '209 patent because claim 1 requires that
16  the PLL circuit make a phase comparison between the local oscillation signal and the first reference
17  signal, whereas in the accused products, the phase comparison is made between divided signals. *See*
18  Daewoo '209 Reply at 4. Daewoo's expert describes the accused products as follows:

19  In the CXA3627N tuner IC, the signal from Crystal X301 is applied to
   a "Ref Osc" block, then to a reference divider, which divides the input
20  signal by a factor of 128, 160, or 256, to generate a signal $f_{REF}$ of
   approximately 31.25, 50, or 62.5 KHz. That $f_{REF}$ signal is there applied
21  to a phase detector block where it is phase-compared to the divided
   output of the local oscillator circuit. In the TDA6503A, the signal
22  from Crystal X301 is applied to a "XTAL Oscillator 4 MHz" block,
   then to a reference divider, which divides the input signal by a factor
23  of 64, 80, or 128, to generate a signal $f_{REF}$ of approximately 31.25, 50,
   or 62.5 KHz. That $f_{REF}$ signal is then applied to a phase comparator
24  block where it is phase-compared to the divided output of the local
   oscillator circuit. In the CXA3627N, it is apparent based on the
25  divisors used that the "Ref Osc" block outputs a frequency of 8 MHz
   such that dividing by 128, 160, or 256 would generate a signal $f_{REF}$ of
26  31.25, 50, or 62.5 KHz.

27  Kang '209 Motion Decl., ¶ 12.

28

19

1    Funai, however, asserts that the reference dividers are themselves part of the PLL circuit.

2    Funai's expert explains that the dividers are necessary to make comparisons of the incoming signal

3    to the reference signal for "modern day" TV channel decoding:

4        Phase lock loop ("PLL") circuitry often uses dividers to convert the
         reference and the incoming signal to a common denominator to
5        facilitate phase comparisons. This allows a reference to be used to
         generate a frequency that is not just a multiple of the reference, but to
6        allow a reference to be used to generate a wider variety of frequencies.
         This assists in making phase comparisons when high frequency signals
7        are to be compared or when there is a significant difference in the
         frequency of the signals to be compared.

8
         For example, if a reference is a 1 kHz signal and no dividers are used
9        the reference can only be used to lock a 1 kHz oscillator, if a divider is
         added to the incoming signal then the locked frequency can be any
10       multiple of 1 kHz. If both the reference and the incoming signals have
         dividers, then arbitrary signals that are not harmonically related can be
11       generated and locked to the reference. The PLLs within the tuner ICs
         in the LGTMI-US5 and SSTMI-US5 tuners incorporate dividers as
12       part of the PLL. Specifically, the TDA6503A in the SSTMI tuner has
         a functional block entitled "REFERENCE DIVIDER" which is part of
13       the PLL; the CXA3627N IC in the LGTMI-US5 tuner has a functional
         block labeled "DIVIDER 1/128 160 256." The reason these dividers
14       are part of the PLL in each respective integrated circuit is [so that]
         television channels, which high frequency signals that are not related
15       to the 3.58 MHz color burst reference, can be properly tuned. By using
         the dividers in the PLL, the tuning system can be locked to a stable
16       reference, and the system will not need to be manually tuned or
         adjusted for each channel. This alleviated the need for fine tuning
17       controls such as those found on older TVs. Fine tuning was needed
         because the frequencies generated to operate the tuner were subject to
18       error and drift. By using a PLL based system with dividers, the user is
         relieved of having to manually adjust the tuning.
19

20   Declaration of Stephen Bristow in Support of Plaintiff's Opposition to Defendants' Motion for

21   Partial Summary Judgment on U.S. Patent No. 6,064,538, 5,987,209 and 5,815,218 (" Bristow '538,

22   '209, and '218 Opposition Decl."), ¶¶ 10-11.

23       Daewoo responds that the claim language requires a comparison between the local oscillation

24   signal and a first reference signal, not the divided signals, but it does not explain why this

25   requirement would not be met if the reference dividers were considered to be part of the PLL

26   circuitry. Daewoo '209 Reply at 4. It also asserts that "a PLL . . . is a specific well-known type of

27   circuit, and there is nothing in the patent to suggest that it does not carry its regular meaning." *Id.*

28

20

United States District Court
For the Northern District of California

1  Yet Daewoo does not cite to any expert testimony that suggests that reference dividers are not used

2  as part of PLL circuits.

3      The Court concludes that Funai's position is the stronger one because it is supported not only

4  by the testimony of Funai's expert but also by intrinsic evidence.  First, in the specification of the

5  '209 patent, the Fourth Embodiment is described as having a PLL circuit that compares divided

6  signals:

7          The PLL circuit 80 employs the same configuration as used in the
          conventional system.  That is, it is adopted to perform PLL control
8          using a frequency signal near 4 MHz at which the crystal unit
          manufacturing cost becomes the most inexpensive as the first reference
9          signal.  More particularly, the second reference signal 87 near 4 MHz
          sent from the chrominance signal circuit 76 is handled as the first
10         reference signal and a signal is generated by dividing the second
          reference signal 87 at a predetermined ratio.  Also, a signal is
11         generated by dividing the local oscillation signal 84 or 85 at a ratio
          specified by the microcomputer 81.  A phase comparison is made
12         between the divided second reference signal 87 and the divided local
          oscillation signal 84 or 85.
13

14  '209 patent, col. 8:65 - col. 9:12.  Although this language describes the invention claimed in claim 4

15  rather than claim 1, it lends some support to the proposition that the dividers were assumed by the

16  inventor to be part of the PLL.

17      Second, the prosecution history contains two references to PLLs that indicate that both the

18  applicant and examiner viewed dividers as part of the PLL.  *See* Press '209 Motion Declaration, Ex.

19  6 (File Wrapper) at FD 471 and FD 475.  In the first reference (FD 471), the applicant refers to the

20  "divisor used in the phase comparison" in the prior art.  As the PLL circuitry is used for

21  accomplishing a phase comparison, this seems to support the conclusion that the applicant

22  understood the divider (also referred to by the experts as divisors) to be part of the PLL.  In the

23  examiner's response (FD 475), the examiner referred to the PLL in the prior art as "PLL (VCO,

24  divider, detector)."

25      Accordingly, the court rejects Daewoo's argument that the accused products do not infringe

26  because the PLL circuit makes a phase comparison of divided signals.

27

28

21

United States District Court
For the Northern District of California

### 2. Role of CCD (Claim 1)

Daewoo argues that the second reference signal generated by the chrominance signal circuit is not also supplied to the PLL signal as the first reference signal, as required under claim 1 of the '209 patent, for the following reason:

> [T]he second reference signal is the output of pin 39 and input to pin 34 of the LA71205M IC which is fed into the YNR (luminance noise reduction)/COMB filter as shown on page 11 of the LA 71205 data sheet [attached to Kang '209 Motion Decl., Ex. 5]. This is not a 3.58 MHz CW signal (p 16, 17), but rather the video signal delayed by 1H. A 2-line YNR comb filter uses a delayed video signal rather than a CW signal as the reference signal to extract chroma. Meanwhile the signal fed to the tuner PLL is the signal from pin 50 as shown on p 19 of the LA71205 data sheet, which is in the form of a sine wave. Accordingly, the second reference signal is not also supplied to the PLL circuit as the first reference signal.

Press '209 Motion Decl., Ex. 4 (Sperber Expert Report) at 5. At his deposition, Dr. Sperber explained his opinion further:

> The first reference signal is used by the CCD to process a precise 1H delay. The CCD, which steps the video pixels through one horizontal line for a 1H delay, ultimately outputs to pin 39. That input to the CCD on its right side, in fact, is the composite video. All we're doing at this point is taking the source video, which came out of the tuner's demodulator or externally one of two other possible source baseband video content through the selection switch, and what we are doing is we are taking that video and we are stepping it through a sequence of charge couple devices at a 3.58 rate, which is the first reference. And the output of that CCD, when we're done, is a 1 H delayed video output. Now, in a particular case, . . . the wave form for 39 and 34 is showing that there is a one line of horizontal with horizontal sync, a rear porch with 3.58 burst on it, and an embedded CCD's video worth of 3.58 chroma content. Well, luma also. But in the case of the figures, it merely shows a constant representative for 34 and 39, a constant 3.58 burst on the active video portion of that horizontal line. So I would not consider that the first reference is converted to a second reference. The first reference in fact is used to operate a CCD device which processes the source video, and the output of that now contains the source videos, lines delayed by 1H and along with that the 3.58 component, keeping in mind that the first reference is already with the other loop in the system, has already been synchronized to the chroma subcarrier's precise frequency.

Press '209 Motion Decl., Ex. 5 (Sperber Depo.) at 40-41.

Funai does not dispute Dr. Sperber's description of the accused device to the extent that Daewoo asserts that the 3.58 MHz signal generated by the crystal oscillator is modified by the CCD to accomplish the 1H delay. Instead, Funai argues that the CCD is *part* of the chrominance signal

1 circuit and therefore, the 3.58 MHz signal that is input into the CCD through pin 41 should be
2 considered the second reference signal, and that signal is the same as the 3.58 MHz signal that is
3 input to the PLL, which is the first reference signal. *See* Opposition at 9-12; Bristow '538, '209, and
4 '218 Opposition Decl., Ex. A (Bristow Expert Report) at 54. Daewoo, in turn, does not dispute that
5 the signal that is *input* through pin 41 in the accused devices is the same as the signal sent by the
6 crystal unit to the PLL/tuner. Therefore, in order to resolve this issue, the court must decide whether
7 the chrominance signal circuit claimed in the patent encompasses the CCD that is used in the
8 accused device.

9 In support of the assertion that the CCD is properly considered part of the chrominance signal
10 circuit, Funai points to: 1) the court's construction of the term "chrominance signal circuit;" 2)
11 excerpts from the '209 specification, including one that refers to a CCD; and 3) a statement by
12 Funai's expert that CCDs can be found in chrominance signal circuits. Daewoo rejects these
13 arguments and in addition points to the prosecution history of the '209 patent, asserting that it
14 indicates that the CCD is not part of the chrominance signal circuit.

15 The court notes at the outset that resolution of this issue is particularly difficult because the
16 embodiment described in the patent that the parties agree actually meets the requirements of claim 1
17 – the Fourth Embodiment – does not process chrominance using a CCD. Conversely, the parties
18 agree that the First Embodiment, which *does* use a CCD, does not met the requirements of claim 1.
19 Rather, the section of the specification describing the First Embodiment supported claims that were
20 later deemed by the examiner to constitute a separate invention. *See* Press '209 Motion Decl., Ex. 6
21 ('209 File Wrapper) at FD 352-53. The inventors therefore chose not to proceed with the claims that
22 this embodiment was intended to illustrate. *Id.* at 439. It is unclear to the court why this
23 "embodiment" was left in the issued '209 patent. With this difficulty in mind, the court addresses
24 whether one of ordinary skill in the art at the time the patent was issued would have considered the
25 CCD to be part of the chrominance signal circuit claimed in the patent.

26 The court begins by looking to the intrinsic evidence. Funai cites two sections of the
27 specification that it asserts show that the CCD is part of the chrominance signal circuit. First, Funai,

28

23

1  argues that "the patent expressly notes that a CCD may be included in a circuit for processing

2  chrominance signals," citing the following text in the specification:

> A Y/C separation circuit 24, which is a comb filter, is connected to the
> CCD 8 for delaying a video signal by using the reference signal of
> which frequency was multiplied by the multiplication circuit 23 as a
> clock signal. The Y/C separation circuit 24 separates the video signal
> (composite signal) 25 output from the video circuit unit 4 into a
> chrominance signal 26 and a luminance signal 27 by detecting line
> correlation, and returns the chrominance signal 26 and a luminance
> signal 27 to the video circuit unit 4.

8  '209 patent, col. 4:42-50. Although this statement describes the First Embodiment, the court

9  nonetheless concludes that it can consider this passage to determine whether it sheds light on the

10  issue at hand. The court concludes that, if anything, this passage supports Daewoo's position. The

11  court is hard-pressed to understand how the quoted language can be interpreted as "expressly" noting

12  that the CCD is part of the chrominance signal circuit. Rather, the passage indicates that it is the

13  Y/C separation circuit that performs the function of the chrominance signal circuit described in the

14  court's claim construction, that is, "generating a signal containing color information." The fact that

15  the CCD is "connected" to the Y/C separation circuit, or even that it processes the signal in a manner

16  that allows the Y/C separation to perform this function, does not persuade the court that the CCD

17  must be considered part of the circuit that *generates* the color circuit. Further, nothing in Figure 3,

18  which illustrates this portion of the specification, suggest that the CCD was considered to be part of

19  the chrominance signal circuit. Rather, the CCD is shown as being part of the CCD-IC 102 while the

20  Y/C separation circuit is shown as being part of the Y/C-IC 101. '209 patent, fig.3.

21  Second, Funai cites to a section of the specification that describes the chrominance signal

22  circuit in the Fourth Embodiment:

> [T]he chrominance signal circuit 76 controls oscillation of the crystal
> unit 77, thereby generating a second reference signal phase-
> synchronized with the burst signal. After separating the video signal
> into a luminance signal and a chrominance signal, the chrominance
> signal circuit 76 generates a color difference signal from the resulting
> chrominance signal based on the second reference signal.

27  '209 patent, col. 8:35-42. This languages also does not support Funai's position. It describes a

28  method of processing color that does not depend on the use of a CCD to delay the signal, as in the

24

1 accused device, and, therefore, offers no insight as to whether a CCD would be considered part of the
2 chrominance signal circuit.

3 Funai also points more generally to the purpose of the chrominance signal circuit, as defined
4 by the court's construction of the term, in support of its assertion that the CCD should be considered
5 part of the chrominance signal circuit. In its Claim Construction Order, the court construed the term
6 "chrominance signal circuit" as "a circuit for generating a signal that contains color information."
7 According to Funai, the CCD must be part of the chrominance signal circuit because: 1) the signal
8 that is input into the CCD comes from the crystal X301, which is part of the IC that contains the
9 chrominance signal circuit; *and* 2) the video signal that the CCD processes contains color
10 information, as acknowledged by Dr. Sperber in the deposition testimony quoted above. Funai
11 Opposition at 11.

12 The court concludes that Funai's reading of the court's claim construction is overbroad: the
13 mere fact that in the accused device the CCD processes a signal that comes from the crystal X301
14 and that contains color information does not mean the CCD itself is part of the circuit that *generates*
15 the color signal. The court finds, instead, that it is not part of this process. In reaching this
16 conclusion, the court adopts Daewoo's position that the signal referred to in the court's claim
17 construction must be the color signal produced by the YNR Comb filter in the accused device (from
18 which the luminance has been removed) and not the signal that is input into the YNR Comb filter
19 after passing through the CCD (which contains both chrominance and luminance). This is because,
20 to the extent that the two signals are qualitatively different, it is the former, and not the latter, that is
21 "generated" by the YNR Comb filter – which the parties agree must be part of the chrominance
22 signal circuit in the accused device.

23 The parties also cite some extrinsic evidence on this question. In particular, Daewoo asserts
24 that "[n]one of the Funai service manuals, DECL service manuals, or third party service manuals
25 produced in this litigation [from the time the '209 application was filed] or earlier contained a CCD
26 section on the video processing chip." Daewoo provides an example of this in the DECL Service
27 Manual for the DV-F462N, dated March 1996. *See* Reply, Ex. A at 26. Funai has not disputed
28 Daewoo's representation regarding the service manuals produced in this litigation. Nor has it

United States District Court
For the Northern District of California

1 disputed that in the example offered by Daewoo, the CCD processor IC is separate from the Y/C

2 Processor IC.  Funai's expert has stated that "[a] CCD may be found within a chrominance signal

3 circuit as contemplated in the '209 patent, and the LA 71205M uses a CCD within the chip for

4 chrominance signal processing."  Bristow '538, '209, and '218 Opposition Decl., ¶ 7.  However,

5 Bristow does not address whether CCDs were generally understood to be part of the chrominance

6 signal circuit at the time the application was filed.  The court finds that this extrinsic evidence has

7 little probative value, indicating only that where a CCD is used to delay a signal before the

8 luminance and chrominance is separated out, the CCD *may* be included as part of the chrominance

9 signal circuit but is not *necessarily* included as part of that circuit.

10 The court concludes that the CCD in the accused device is not part of the chrominance signal

11 circuit.  As a result, the limitation that requires the same signal be sent to the PLL and the

12 chrominance signal circuit is not met in the accused devices and Daewoo is entitled to summary

13 judgment that the accused devices do not literally infringe the '209 patent.

### 3.  Whether Chrominance Signal is Based on IF Signal (Claim 1)

15 Daewoo asserts that in the accused products, the chrominance signal circuit does not generate

16 a chrominance signal "based on the IF signal" because the IF signal from the tuner mixer circuit is

17 demodulated in the IF demodulator chip, producing a baseband video signal, and it is based on this

18 baseband signal (rather than the IF signal) that the chrominance signal is generated.  In support of

19 this assertion, Daewoo's expert states:

20 The chrominance signal circuit in the accused Daewoo products
generates the chrominance signal based on the baseband video signal
21 input into the LA71205 at pins 28, 30, and 32 (depending on the
selected video source).  Pin 30 is connected to the output of the IF
22 demodulator chip in the 3-in-1 tuner, which demodulates the IF signal
from the tuner mixer circuit and outputs a baseband video signal.  As
23 such, the chrominance signal circuit operates on the baseband video
signal, not the IF signal.

24

25 Declaration of Dong Han Kang in Support of Motion for Partial Summary Judgment on U.S. Patent

26 No. 5,987,209 ("Kang '209 Motion Decl."), ¶ 13.

27 The court is not persuaded by Daewoo's argument.  Because the baseband video signal

28 referred to by Daewoo's expert is, in fact, a demodulated IF signal, the chrominance signal can be

United States District Court
For the Northern District of California

26

1  considered to be "based on" an IF signal as the words "based on" are commonly understood. In

2  particular, an IF signal that has been modified on its way to the chrominance signal circuit may

3  nonetheless be based on the IF signal, as is illustrated by Figure 8. Figure 8 is a schematic of the

4  Fourth Embodiment and shows that the IF signal sent from the mixer circuit is both amplified in the

5  IF Amplifier Circuit and detected in the Video Detector Circuit before reaching the Chrominance

6  Signal Circuit. *See* '209 patent, col. 8:5-25 & fig.8. Thus, the court concludes that the term "based

7  on" as used in the '209 patent does not preclude demodulation of the IF signal before that signal is

8  input in the chrominance signal circuit.

9  **4.  Detector Between Mixer and Chrominance Signal Circuit (Claim 5)**

10  In the motion, Daewoo asserted that "in the accused products, there is nothing that could be

11  characterized as a detector for detecting the IF signal from the mixer circuit, with the output of such

12  detector supplied to the chrominance signal circuit," as required under claim 5 of the '209 patent. In

13  its Opposition, however, Funai quotes testimony by its expert that identifies structures it asserts meet

14  this limitation. *See* Opposition at 16 (quoting Bristow '538, '209, and '218 Opposition Decl., Ex. A

15  (Bristow Expert Report) at 60). Daewoo did not respond to Funai's evidence in its Reply brief.  Nor

16  did it point to any evidence showing that Funai's expert is incorrect at oral argument. Accordingly,

17  the court finds that Daewoo has conceded it is not entitled to summary judgment on this issue.

18  **5.  Doctrine of Equivalents**

19  Daewoo asserts that to the extent Funai has not established literal infringement, it also cannot

20  establish infringement under the doctrine of equivalents, particularly as to the requirement that the

21  same reference signal, generated by a single crystal, is sent to the tuner PLL and the chrominance

22  signal circuit, which was added as a limitation to overcome prior art.  The court agrees.

23  After claim 1 (application claim 11) was rejected over prior art, the claim was amended to

24  add the language requiring that the first and second reference signals be the same. *See* Press '209

25  Motion Decl., Ex. 6 (File Wrapper) at FD 499. The examiner allowed the claim based on the

26  amendment, stating the reason for the allowance as follows:

27  [N]one of the prior art of record, alone or in combination, teaches or
     suggests a combination of a PLL circuit and a chrominance circuit
28  provided with a single crystal unit, wherein the single crystal unit

27

1

2

3

> generates a second reference signal for generating a chrominance
> signal based on an IF signal from a mixer circuit and supplies a second
> reference signal as a first reference signal to the PLL circuit and using
> the signal from the PLL circuit to convert a RF signal to the IF signal
> at the mixer circuit as specified in [application] claim 11.

4  *Id.* at FD 505.  In light of this prosecution history, the burden is on Funai to rebut the presumption of

5  estoppel.  *See Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 736 (2002).

6  Funai, however, pointed to no evidence on this question, essentially conceding that the amendment

7  of claim 1 during prosecution precludes it from relying on the doctrine of equivalents with respect to

8  the accused devices.  Accordingly, Daewoo is entitled to summary judgment that the accused devices

9  do not infringe under the doctrine of equivalents.

10  ### D.  Conclusion

11  Defendants' Summary Judgment Motion ('209 Patent) is GRANTED IN PART and DENIED

12  IN PART.  The court finds that the accused products do not infringe the '209 patent, either literally

13  or under the doctrine of equivalents.  The court does not reach Daewoo's arguments concerning

14  invalidity.  *See Architectural Models, Inc. v. Neklason*, 264 F. Supp. 312, 318 (C.D. Cal. 1967)

15  (citing *Alvater v. Freeman*, 319 U.S. 359, 363 (1942) in support of conclusion that where court had

16  found non-infringement, it was not appropriate to reach invalidity arguments because "[t]o hold a

17  patent valid if it is not infringed is to decide a hypothetical case").

18  ## VIII.  THE '210 PATENT

19  ### A.  Background

20  The '210 patent was issued July 16, 2002, and is entitled "Mechanism for Preventing

21  Propagation of Driving Motor Noise and Vibration on a Tape Deck and Tape Deck Having the

22  Same."  In the Claim Construction Order, the court explained:

23

24

25

26

27

28

> VCRs use capstan motors to draw the tape past the video head so that
> the VCR can convert the information stored on the tape into an image
> displayed on a television.  Prior art motors controlled the speed of the
> motor by controlling the amplitude of power applied to the motor.
> Pulse width modulation ("PWM") motors control the speed by
> controlling the duration that power is applied to the motor.  These
> motors are less expensive, but produce higher electrical noise than
> prior art methods.  This electrical noise can travel from the motor
> through the motor mount and into the video processing circuit.  This
> noise can degrade the video quality produced by the VCR.  One of the
> patents-in-suit, the '210 patent, describes a structure that reduces the

United States District Court

For the Northern District of California

28

1
2
> noise originating in the capstan motor that reaches the video
> processing circuit, thereby maintaining video quality.

3    Claim Construction Order at 3. The mechanism that is used to achieve this result includes a bearing
4    holder made of "insulating material." '210 patent, claims 1, 2, 5, 7 and 9.[3]

5        In its Claim Construction Order, the court construed the term "insulating material" as "a
6    material with poor electrical conduction that acts to suppress switching noise generated by pulse
7    width modulation control of the direct driving motor, thereby suppressing the video screen and audio
8    noise caused by electrical noise produced by the capstan motor." Claim Construction Order at 23. In
9    adopting this construction, the court rejected Daewoo's argument that an "insulating material" must
10   have specific resistance (resistivity) of $10^7$ Ohm-cm or greater. *Id.* at 21-23. The court also declined
11   to adopt Funai's proposed construction, which defined "insulating material" as "a material that
12   exhibits sufficiently poor conduction of electricity to suppress switching noise generated by pulse
13   width modulation control of the direct driving motor." *Id.*

14       Funai asserts that Daewoo's accused products infringe independent claims 1 and 5, as well as
15   dependent claims 2, 4, 6-7, and 9-10.

16   **B.    The Motions**

17       Plaintiff and Defendants seek summary judgment on the questions of both infringement and
18   invalidity.

19       **1.    Infringement**

20       With respect to infringement, the parties dispute whether the Lexan polycarbonate bearing
21   holder used in Daewoo's products is made of an "insulating material" as called for under all of the

22
23
24

25       [3] Claim 1 reads, in relevant part, "wherein said bearing holder is made of an insulating material."
26   '210 patent, col. 6:62-63. Claim 2 reads, in relevant part, "said direct driving motor is mounted on said
     deck chassis through an insulating material." '210 patent, col. 6:66-67. Claim 5 reads, in relevant part,
     "bearing holder which is made of an insulating material." '210 patent, col. 7:22-23. Claim 7 reads, in
27   relevant part, "said supporting member . . . made of an insulating material." '210 patent, col. 8:12-14.
     Claim 9 reads, in relevant part, "an insulating material intervened between said projection and said
28   motor PCB." '210 patent, col. 8:22-23.

29

United States District Court
For the Northern District of California

1  claims of the '210 patent.[4] Daewoo asserts that the particular type of Lexan used in its products,
2  which is a "filled Lexan," is not an "insulating material" at all, but rather is a conductive material
3  with very low resistivity, in the range of $10^0$ to $10^2$ Ohm-cm.

4       Daewoo further asserts that Funai cannot rely on the doctrine of equivalents because the
5  doctrine of prosecution history estoppel applies to the requirement for an insulated bearing holder.
6  Daewoo '210 Motion at 12. According to Daewoo, "original claims 1 and 2 were rejected over prior
7  art, while original claim 4 was allowed due to the additional limitation." *Id.* Daewoo continues,
8  "[o]riginal claims 1-2 were then cancelled with prejudice in light of the prior art, and claim 4 was
9  then rewritten in independent form." *Id.* In addition, Daewoo argues that the accused products
10 cannot infringe under the doctrine of equivalents because treating a material that is not an insulating
11 material as an insulating material would totally eliminate the limitation.

12      Funai argues that Daewoo's position on infringement is an attempt to reargue the question of
13 whether a material must fall within a specific range of resistivity to be considered an "insulating
14 material" under the '210 patent – a question which was already resolved in Funai's favor in the
15 court's Claim Construction Order. According to Funai, under the court's construction of "insulating
16 material," so long as Daewoo's bearing holder achieves the function of reducing switching noise, it
17 satisfies the requirements for an "insulating material." Funai further points to test results obtained by
18 its expert, Dr. Kazerooni, that it says establish that the Daewoo bearing holders act to suppress
19 switching noise and therefore infringe the '210 patent.

20      Addressing Daewoo's assertion that it is entitled to summary judgment as to infringement
21 under the doctrine of equivalents, Funai rejects Daewoo argument that prosecution history estoppel
22 applies. Funai further asserts that there is evidence of equivalence, namely, Dr. Kazerooni's test
23 results, that preclude summary judgment on this issue in favor of Daewoo.[5]

---

25     [4] Daewoo has admitted that every other element of claim 1 of the '210 patent is met by its
26 accused VCRs. *See* Ojha Motions Decl., Ex. G at 4 (Response to Plaintiff's Request For Admission No. 64).

27     [5] Funai does not seek summary judgment in its own favor on the question of equivalency,
28 arguing instead that it is entitled to summary judgment of infringement on the basis that the accused
   devices *literally* infringe the '210 patent.

United States District Court
For the Northern District of California

1  Daewoo's expert, Dr. Rice, asserts in a supplemental declaration that the test results are

2  invalid due to flaws in Dr. Kazerooni's methodology.

### 2. Invalidity

4  Daewoo asserts that claim 5 of the '210 patent is invalid because it was anticipated by

5  Daewoo's own prior art product, the DECL FM-Mecha VCR, which Daewoo alleges includes all of

6  the elements of claim 5, including the use of an insulated bearing holder. Daewoo concedes that the

7  DECL FM-Mecha does not actually anticipate claim 1 of the '210 patent because it does not use

8  PWM control, as called for in claim 1. It argues, however, that claim 1 is obvious because there

9  would have been a motivation to incorporate the PWM control of the '210 patent into the DECL

10  FM-Mecha design to achieve the same benefits of PWM control that are referenced in the '210

11  patent, namely, power-saving, high resistance to voltage [and] speed-up and suppression of heating."

12  *See* Funai Motion at 14 (quoting '210 patent, col. 1:16-20). Daewoo notes that the '210 patent itself

13  acknowledges that use a PWM controller was well known in the prior art. Daewoo '210 Motion at 7

14  (citing '210 patent, col. 1:14-27).

15  Daewoo also points to Japanese Patent Publication 5-191958 ("the '958 patent) as evidence

16  of obviousness. According to Daewoo, the '958 patent, like the FM-Mecha, includes all the

17  elements of claim 1 except PWM control. In support of this assertion, Daewoo points to testimony

18  by Funai's expert (Kazerooni) that Daewoo asserts amounts to an admission that all the elements of

19  claim 1 of the '210 patent are found in the '958 patent except the PWM limitation. *See* Daewoo

20  '210 Reply at 5 (citing Press Reply Decl., Ex. 4 (Kazerooni Depo.) at 138). Daewoo further asserts

21  that "the '958 patent can be read for itself" and points to a chart in its '210 Opposition brief that it

22  says shows that the '958 patent discloses all the limitations of claim 1 of the '210 patent except

23  PWM control. *See* Daewoo '210 Opposition at 10-12. Like the FM-Mecha, Daewoo asserts, the

24  '958 patent renders the '210 patent obvious because there would have been a motivation to combine

25  the invention disclosed in the '958 patent with the PWM control that was already in the prior art.

26  Funai asserts that Daewoo's invalidity arguments fail for several reasons. First, it points to

27  the absence of any evidence that actually documents sales of the DECL FM-Mecha in the United

28  States – a threshold requirement to be considered "prior art." The primary evidence of United States

United States District Court
For the Northern District of California

1 sales, the "uncorroborated declaration" of Daewoo employee and expert Dong Han Kang that he has

2 "personal knowledge" that the FM-Mecha VCRs were sold in the United States in 1995 and 1996, is

3 inadequate to meet the "clear and convincing" evidence standard that Daewoo must meet to establish

4 invalidity, Funai asserts.

5 Second, Funai argues that Daewoo has not established that all the limitations of claim 1

6 except PWM control are met by the '958 patent. Funai notes that Daewoo offered no expert

7 testimony on this question and further, Daewoo's expert stated in his deposition that he had not

8 analyzed whether the '958 patent disclosed each of the limitations in the '210 patent.

9 Third, Funai argues that there was no motivation to combine because those who were skilled

10 in the art at the time of the invention: 1) were not aware of any noise problems caused by PWM

11 controllers; and 2) were not aware that insulated bearing holders could be used to reduce noise from

12 any source. In support of this position, Funai cites deposition testimony by Daewoo's experts.

13 Finally, Funai points to evidence of three "secondary considerations" that show the '210

14 invention was not obvious: 1) unexpected result; 2) long-felt need; and 3) commercial success.

15 ## C. Literal Infringement

16 Daewoo asserts that its accused devices do not literally infringe the '210 patent, as a matter of

17 law, because the material used in the bearing holders of the accused products does not have "poor

18 electrical conduction," and therefore is not "insulating," as is required by the court's claim

19 construction. Daewoo's expert, Dr. Rice, explains:

20 The bearing holder used in the accused Daewoo products is not a
"pure" Lexan polycarbonate, rather the bearing holder is constructed of
21 a "filled" Lexan polycarbonate which has carbon and glass fibers
added. The specific material used in the accused products is Lexan
22 LCG0820. This designation indicates that it is filled with 8 percent
carbon and 20 percent glass fibers. The carbon fibers are specifically
23 added to **increase** the thermal and electrical conductivity of the
material.
24
An unfilled polymer resin such as Lexan has a volumetric resistivity of
25 approximately $10^{14}$ to $10^{16}$ ohm-cm, which would certainly be
considered to [be] an insulating material by one skilled in the art. As
26 Kazerooni acknowledges, the bearing holder Lexan has a volumetric

27

28

32

> resistivity in the range of $10^0$ to $10^2$ ohm-cm. This [conductivity][6] is at least 12 orders of magnitude greater than that of the unfilled Lexan. Such material certainly falls in the range of what is considered to be a "conductive resin."
>
> A conductive resin such as LCG0820 is specifically suggested for use in electrical applications to increase the electrical conductivity such that it will serve to suppress the buildup of a static charge. Daewoo specifically chose a conductive resin rather than an insulating material for the dissipation of static buildup. To perform the function of dissipating static, the bearing holder is specifically engineered in the accused Daewoo products to be conductive, not an insulator.

Declaration of Daniel M. Press In Support of Motion for Partial Summary Judgment on U.S. Patent No. 6,421,210 ("Press '210 Motion Decl."), Ex. 4 (Rebuttal Report of Dr. James Rice Submitted by Daewoo Electronics Corporation, Et Al. ("Rice Rebuttal Report")), ¶¶ 39-41 (emphasis in original).

Funai does not point to any expert testimony suggesting that the filled Lexan used in the accused products would be considered by one skilled in the art as a "material with poor electrical conduction." Nor does Funai's expert appear to dispute Daewoo's assertion that the material used in its bearing holders has a resistivity of between $10^0$ to $10^2$ Ohm-cm. *See* Press '210 Motion Decl., Ex. 3 (Rule 26(A)(2)(B) Expert Disclosure of H. Kazerooni, Ph.D. ("Kazerooni Expert Report")) at 20 n.1. Rather, Funai argues that the court's definition of an "insulating material" is purely functional: if the bearing holders suppress switching noise, Funai argues, they are made of insulating material. Further, Funai asserts, any argument that a material is not insulating based on the degree of resistivity of that material is an attempt to limit the claim to a specific range of resistivity.[7]

---

[6] In his report, Dr. Rice used the word "resistivity" rather than "conductivity." In a subsequent declaration, Dr. Rice stated that this was a typographical error. *See* Declaration of Dr. James Rice in Opposition to Motion for Summary Judgment on U.S. Patent No. 6,421,210 ("Rice '210 Opposition Decl."), ¶ 13.

[7] Funai asserts that even if poor electrical conduction is a separate requirement, that requirement is met in the accused products. *See* Funai Summary Judgment Motion ('210 Patent) at 10-11. However, it points only to Rice's deposition testimony that Lexan is more resistive than metal, *see* Ojha Motions Decl., Ex. E at 94, and Rice's statement in an article that "conductive resins with ER ranging from approximately $10^2$ ohm-cm to $10^{-1}$ ohm-cm are used for *slightly electrically conducting applications*." *Id.*, Ex. M at 2 (emphasis added). No expert, however, testifies that the *filled* Lexan used in the accused products has poor electrical conduction.

United States District Court

For the Northern District of California

1    Funai's argument has no merit.  Under Funai's approach, a material could be considered

2    "insulating material" no matter how conductive the material, so long as the bearing holder reduced

3    switching noise.  Such a result, however, is inconsistent with the court's construction of the claim

4    language.  As noted above, the court rejected Funai's argument that the term "insulating material"

5    should be defined entirely in terms of the function of reducing switching noise.  Instead, it construed

6    the term as calling for "a material *with poor electrical conduction* that acts to suppress switching

7    noise . . . ."  While the Court declined to adopt a specific range of resistivity as part of its definition

8    of the term, it clearly included a requirement that the material be one that an individual skilled in the

9    art would consider to have "poor electrical conduction."  A bearing holder that would be considered

10   by one skilled in the art to be conductive rather than having poor electrical conduction does not

11   satisfy this requirement.

12       Having failed to produce any evidence that one of ordinary skill in the art would consider

13   Funai's bearing holders to be made of material with "poor electrical conduction" and in the face of

14   Daewoo's expert testimony that its bearing holders are made of conductive material, the court

15   concludes that Daewoo is entitled to summary judgment of literal non-infringement on this basis.

16       **D.    Doctrine of Equivalents**

17       Daewoo asserts that it is also entitled to summary judgment that the accused products do not

18   infringe the '210 patent under the doctrine of equivalents.  The court disagrees.

19       First, the court does not find that the prosecution history estoppel applies.  As noted above,

20   prosecution history estoppel arises where the applicant has added claim language that narrows a

21   claim to overcome prior art.  Here, however, the insulated bearing holder requirement was included

22   in original application claim 4 (issued claim 1), and that claim was not rejected over the prior art.

23   *See* Declaration of Daniel M. Press in Support of Motion for Partial Summary Judgment on U.S.

24   Patent No. 6,421, 210 ("Press '210 Motion Decl."), Ex. 6 (File Wrapper) at FD 7227-7228 (original

25   claim 4), FD 7254 (Office Action Summary allowing claim 4, FD 7257 (Detailed Action stating

26   claim 4 is allowed without elaboration).  Although the examiner *did* reject application claims 1 and 2

27   over prior art – neither of which included the insulative bearing holder requirement – the examiner

28   did not state in the Office Action rejecting those claims and allowing application claim 4 that the

**United States District Court**
For the Northern District of California

1  reason for distinguishing between application claims 1 and 2 and application 4 was the insulative

2  bearing holder requirement. Nor can the court draw such an inference, given that the claims differed

3  in other respects as well.[8] Further, although application claim 4 was amended to convert it from a

4  dependent claim to an independent claim, the language requiring an insulating bearing holder was

5  not changed as part of that amendment. *See id.*, FD 7264-7265 (showing that the words "wherein

6  said bearing holder is made of an insulating material" were left unchanged from the original claim).

7  Finally, it is undisputed that issued claim 5 (application claim 9), which also contains the insulative

8  bearing holder requirement was neither rejected over prior art nor amended with respect to this

9  requirement.

10      Second, the Court is not persuaded by Daewoo's conclusory assertion that the doctrine of

11  equivalents cannot apply because to treat a material that is not insulating as one that is insulating

12  would eliminate the requirement. The question of equivalence is, ordinarily, a fact question, and in

13  this case, the parties' experts have pointed to conflicting evidence on this question: Dr. Kazerooni

14  has pointed to test results that allegedly show that the filled Lexan used in the bearing holders of the

15  accused products is insubstantially different from the insulating material that is claim with respect to

16  the way the accused devices work; Dr. Rice argues that Dr. Kazerooni's test methodology is flawed.

17  This is a factual question that must be resolved by the jury.

18      **E.    Invalidity**

19          **1.    The DECL FM-Mecha**

20      Daewoo seeks summary judgment that the FM-Mecha anticipates claim 5 of the '210 because

21  it meets all the claim limitations of that claim 5. Daewoo further seeks summary judgment that

22  claim 1 of the '210 patent, and all the claims that depend on claim 1, are rendered obvious by the

23  FM-Mecha because the only limitation of claim 1 that is not met is PWM control and there would

24

25

26

27      [8] Even if the examiner had expressly stated that this was the reason for his allowance of

28  application claim 4, it is unlikely that the doctrine of prosecution history estoppel would apply, given
    that the relevant claim language was not narrowed in response to an amendment.

1  have been a motivation to combine the FM-Mecha with PWM control, which was well-known in the

2  prior art.[9]

3       As a threshold matter, the court must address Funai's argument that the FM-Mecha is not

4  prior art because the evidence of sales in the United States is so weak that a reasonable jury could not

5  find by clear and convincing evidence that the device was sold in the United States. The court

6  agrees.[10]

7       The only evidence presented by Daewoo that the FM-Mecha was actually sold in the United

8  States is a declaration by Daewoo employee Dong Han Kang in which he states that he has

9  "personal knowledge that FM-Mecha VCR's, with the specified capstan motor, were sold in the

10  United States by DECL in 1995 and 1996."[11] Dong Han Kang '210 Motion Decl., ¶ 3. The basis for

11  this personal knowledge is unclear in the declaration, however. Kang does not provide a precise date

12  on which his employment with Daewoo commenced, but he describes his duties only "[f]rom and

13  after 1996." *Id.* at ¶ 2. He does not relate how his duties, which "involved the design and production

**United States District Court**

For the Northern District of California

[9] Although Daewoo provided a copy of the FM-Mecha Technical Service Guide, *see* Declaration of Dong Han Kang in Support of Motion for Partial Summary Judgment on U.S. Patent No. 6,421,210 ("Dong Han Kang '210 Motion Decl."), Ex. 1 (Technical Service Guide), Daewoo has not asserted that the manual itself constitutes prior art. Nor has it challenged Funai's assertion that manual would not demonstrate anticipation or obviousness because it does not disclose – either expressly or inherently – the use of bearing holders made of an insulated material

[10] The court notes that Daewoo does not argue that the FM-Mecha is prior art on the basis that it was "known" under § 102(a) or in "public use" under § 102(b). Nor is there any evidence in the record that suggests that either requirement is met. At oral argument, Daewoo stipulated that it is only asserting that the FM-Mecha is prior art under 35 U.S.C. § 102 (b) on the basis that it was sold in the United States.

[11] Daewoo also points to the "DECL FM-Mecha NTSC Service Guide" as evidence of U.S. sales, pointing out that the "NTSC standard is the video/TV standard for the United States." Dong Han Kang '210 Motion Decl., ¶ 3. However, Funai's evidence shows that the NTSC standard is also used in many other countries as well. *See* Declaration of Harry F. Doscher in Support of Funai's Reply in Support of its Motion for Summary Judgment on U.S. Patent No. 6,421,210 ("Doscher '210 Reply Decl."), Ex. 1, Appendix 1 (listing systems used for VHF broadcasting by country). Therefore, this evidence is of little probative value. Similarly, the Court does not find persuasive evidence cited by Daewoo that a DECL capstan motor that used an insulating bearing holder was *approved* in 1996 for use in a "U.S. market VCR." *See* Dong Han Kang '210 Motion Decl., Ex. 2 (emphasis added). The document cited is almost entirely in Korean and Daewoo has provided no translation. Nor has Daewoo presented any evidence that the motor was actually used in the particular VCR cited or evidence documenting sales of that VCR in the United States.

36

of electronic and mechanical engineering aspects of the VCR mechanism," *id.*, allowed him to obtain personal knowledge that the FM-Mecha was sold in the United States.

Nor was Kang able to provide any details at his deposition indicating "personal knowledge" of U.S. sales. Rather, Kang's testimony indicates that his statement in his declaration was based on hearsay:

> Q:  And how do you know [the FM-Mecha] was in a product sold in 1995?
>
> A:  Because I saw such a product being sold at the time . . .
>
> Q:  So you remember from 1995?
>
> A:  Although I do not know exactly when this product was first sold, but the time frame when I looked at or saw these products mostly was between the time frame of '95 and '96 in that neighborhood.
>
> . . .
>
> Q:  Do you know if there are any records existing that shows sales of any VCRs having this FM Mecha?
>
> A:  I would think that there is none because it was a while ago.
>
> Q:  When you say that you – did you see these products in the Daewoo facility?
>
> A:  Yes. At the factory, at the plant.
>
> . . .
>
> Q:  Do you know where these products were sold?
>
> A:  My understanding is that they were sold all over the world, including Europe and the Americas.
>
> Q:  And what do you base that understanding on?
>
> A:  Just based on my experience, based on my experience of working at the factory at the time. So I heard as to where these products were sold to.
>
> Q:  And from whom did you hear where these products were sold to?
>
> A:  Since I was working at the factory at the time, I'm thinking probably from the people who were working on the production, I would think.
>
> . . .

United States District Court

For the Northern District of California

1    Q:    Did you have any responsibility for the FM Mecha?

2    A:    No, not for this. At the time I was working or responsible for
           the equipment at the factory, not for any product per se.
3

4    Ojha Motions Decl., Ex. K (Kang January 6, 2007 Depo.) at 746-48.

5         Because Kang's statements are based on what he was told by others, they are hearsay under

6    Rule 801 of the Federal Rules of Evidence and therefore inadmissible under Rule 802. Nor is there

7    any evidence that suggests that any exception to the hearsay rule applies. Because only admissible

8    evidence may be considered on summary judgment, *see Miller v. Glenn Miller Prods., Inc.*, 454 F.3d

9    975, 988 (9th Cir. 2006), the court concludes that Daewoo has failed to establish even a factual

10   dispute on the question of whether the FM-Mecha was sold in the United States. Accordingly,

11   Daewoo's request for summary judgment of invalidity based on the FM-Mecha fails: Funai is

12   entitled to summary judgment that the '210 invention is not invalid as anticipated or obvious based

13   on the FM-Mecha because there is no evidence that that device constitutes "prior art."

14              **2.    The '958 Patent**

15        As an alternative basis for its invalidity argument, Daewoo points to the '958 patent,

16   asserting that it discloses all the elements of claim 1 of the '210 patent except PWM control, and that

17   in light of other prior art disclosing PWM control, claim 1 was obvious when the patent issued, as a

18   matter of law. Funai, on the other hand, asserts that it is entitled to summary judgment on this issue

19   because: 1) Daewoo has not demonstrated that the '958 patent disclosed all the claim elements

20   except PWM control; 2) there was no motivation to combine; and 3) there is evidence of secondary

21   considerations that show that the '210 invention was not obvious. Because factual questions remain

22   as to all of these issues, neither Daewoo nor Funai is entitled to summary judgment on the subject of

23   invalidity based on the '958 patent.

24              **a.    Claim Elements**

25        As discussed above, in order to establish that an invention is obvious in light of prior art, a

26   party must show that the claimed invention is a "combination which only unites old elements with no

27   change in their respective functions." *Great Atl. and Pac. Tea Co. v. Supermarket Equip.*, 340 U.S.

28   147, 152-53 (1952). Daewoo attempts to do this by identifying in a chart – apparently prepared by

1 counsel – the specific elements that are found in the '958 patent and in claim 1 of the '210 patent.

2 Daewoo '210 Opposition at 10-12. To the extent the chart is supported by the '958 patent itself, it is

3 sufficient to create a fact question as to Daewoo's assertion that the '958 patent includes all the

4 elements of the invention claimed in claim 1 of the '210 patent except PWM control. It is not,

5 however, sufficient to establish the scope of the '958 patent as a matter of law. Nor is the court

6 persuaded by Daewoo's assertion that Funai's expert conceded this point at his deposition. *See*

7 Daewoo '210 Reply at 5 (citing Press '210 Reply Decl., Ex. 4 (Kazerooni Depo.) at 4).[12] Having

8 reviewed this deposition testimony, the court finds no such concession.

9 As the Federal Circuit has noted, it is not "the task of the district court to attempt to interpret

10 confusing or general testimony to determine whether a case of invalidity has been made out,

11 particularly at the summary judgment stage." *Schumer*, 308 F.3d at 1315. Daewoo has not presented

13 [12] Daewoo does not cite any particular lines on page 138 of the Kazerooni deposition transcript, the content of which is provided below, in its entirety:

| | |
|---|---|
| Q: | So having gone through that, is it your opinion that apart from the PWM control, all elements of claim 1 of the '210 patent are disclosed in the '958 patent? |
| Counsel: | Objection, vague and mischaracterizes testimony. |
| A: | There are other elements in '210 patent that are not disclosed. |
| Q: | What else – I'm talking just about claim 1. |
| A: | Well, I'm looking at Claim 1. Do you want me to point it to you to tell you what – |
| Q: | I want you to tell me what is not disclosed. |
| A: | It says, the last one, "Wherein said bearing holder is made out of said insulating materials." |
| Q: | We just went over the fact that the disclosure of prior art in the '958 patent disclosed a motor to the bearing holder made of an insulating material, correct? |
| A: | The prior art shows nonconductive – I'm sorry. The prior art shows something that's high resistance, which we said that's insulating material [cut off]. |

28 Press '210 Reply Decl., Ex. 4 at 138.

United States District Court
For the Northern District of California

1  expert testimony comparing the scope of the '958 patent to claim 1 of the '210 patent and in fact, its
2  expert admitted in deposition that he had not conducted such an analysis. *See* Ojha Motions Decl.,
3  Ex. E (Rice Depo.) at 123. Given that the scope of prior art is generally a question of fact for the
4  jury, *see Graham*, 383 U.S. 1, 17 (1966), the court concludes that summary judgment on this
5  question (in favor of either party) is not justified.

**b.    Motivation to Combine**

7  Funai asserts that there was no motivation to combine the use of an insulating bearing holder
8  with PWM control because those who were skilled in the art at the time the '210 patent was issued
9  were unaware both that PWM control caused noise problems and that the use of an insulated bearing
10 holder could be used to reduce noise. *See* Funai '210 Opposition at 6-8 (citing Ojha Motions Decl.,
11 Ex. E (Rice Depo.) at 113-17 (testimony of Daewo expert Rice that he was unaware of any
12 "motivation or suggestion" to combine PWM and insulated bearing holders in the prior art, that he
13 was unaware of any awareness in the prior art that PWM control causes noise problems, and that he
14 was unaware of any awareness in the prior art that insulated bearing holders could be used to reduce
15 noise)). Daewoo, in turn, asserts that under *KSR*, it is not required to show that there was a
16 motivation to combine and in any event there were motivations other than solving the problem of
17 noise reduction. For example, the '210 patent itself cited reasons for using PWM control, namely "to
18 achieve power-saving, high resistance to voltage, speed-up and suppression of heating." '210 patent,
19 col. 1:16-22. Thus, Daewoo asserts, there would have been reasons to incorporate PWM control into
20 a VCR design that used insulated bearing holders.

21 The court concludes that Funai's focus on whether there was a motivation to combine based
22 on the perceived need to reduce noise resulting from PWM control is too narrow, in light of *KSR*. In
23 particular, the Supreme Court warned that the motivation inquiry is not limited to the problem
24 motivating the patentee. 127 S. Ct. at 1742. Rather, "[u]nder the correct analysis, any need or
25 problem known in the field of endeavor at the time of the invention and addressed by the patent can
26 provide a reasons for combining the elements in the manner claimed." *Id.*

27
28

United States District Court
For the Northern District of California

40

1    Here, Daewoo and Funai have pointed to some evidence that there was – or was not– a
2    motive to combine. This evidence is sufficient to create a fact question that must be resolved by the
3    jury.

### c. Secondary Considerations

5    In *KSR*, the Supreme Court cited with approval *Graham* for the proposition that secondary
6    considerations such as "commercial success" and "long felt but unsolved needs" "might be utilized
7    to give light to the circumstances surrounding the origin of the subject matter sought to be patented."
8    127 S. Ct. at 1734 (quoting *Graham*, 383 U.S. at 17-18). The Court further noted that when
9    "elements work[] together in an unexpected and fruitful manner" this supports of finding of non-
10   obviousness. *Id.* at 1740 (*citing United States v. Adams*, 383 U.S. 39, 51-52 (1966)).

11   Here, Funai has presented evidence that individuals who were skilled in the art were unaware
12   that PWM control would result in switching noise and therefore, the disclosure of the '210 patent
13   that use of an insulated bearing holder could solve this problem was unexpected. *See* Funai '210
14   Opposition at 8 (citing Ojha Motions Decl., Ex. E (Rice Depo.) at 110-13, Ex. X (Kang Depo.) at
15   154 & Z (Kazerooni Expert Report) at 8-9. Funai has also presented evidence that its products that
16   practice the '210 invention have been a commercial success. *See* Ojha Motions Decl., Ex. Z
17   (Kazerooni Rebuttal Report); Declaration of Robert Edesess in Support of Funai's Opposition to
18   Daewoo's Motion for Partial Summary Judgment on U.S. Patent No.s 6,421,210, RE 37,332 and
19   5,987,209 ("Edesess Opposition Decl."), Ex. 2 (Supplemental Expert Report of Paul K. Meyer).

20   Funai's evidence does not persuade the court that the '210 patent was obvious as a matter of
21   law. Rather, this evidence should be considered by the jury. Accordingly, the court DENIES both
22   parties' requests for summary judgment on this question.

### F. Conclusion

24   For the reasons stated above, Defendants' Summary Judgment Motion ('210 Patent) is
25   summary judgment is GRANTED on the question of literal infringement of the '210 patent and
26   DENIED on the question of infringement under the doctrine of equivalents. Plaintiff's Summary
27   Judgment Motion ('210 Patent) is DENIED on the question of literal infringement. On the question
28   of invalidity, Defendants' Summary Judgment Motion ('210 Patent) is DENIED as to both the FM-

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1  DECL and the '958 patent; Plaintiff's Summary Judgment Motion ('210 Patent) is GRANTED as to

2  the FM-DECL and DENIED as to the '958 patent.

3  **IX.    THE '218 PATENT**

4         **A.    Background**

5         The '218 patent is entitled "Circuit Device Including RF Converter, Tuner and IF Amplifier"

6  and issued on September 29, 1998, from an application filed January 4, 1996. The '218 patent

7  application claimed priority from two Japanese applications, filed on January 14, 1995, and April 14,

8  1995. The invention disclosed in the '218 patent relates to "three-in-one tuners," that is, circuit

9  devices that include an RF converter, a tuner for tuning a television signal, and an IF amplifier for

10  demodulating the television signal. *See* '218 patent, col. 2:17-31 (Summary of Invention).

11        The '218 patent includes 9 claims. Funai asserts that Daewoo's products containing US5

12  version three-in-one tuners infringe claims 1 and 5 of the '218 patent. Claim 1 provides as follows:

13                    1.      A circuit device provided in a video signal processing
                             apparatus, said circuit device comprising:
14
                      a tuner for tuning a television signal and means for supplying a
15             plurality of RF television signals from an antenna to the tuner via an
               antenna input terminal, said tuner being arranged to convert an RF
16             television signal into an IF television signal;

17                    An IF amplifier for amplifying and demodulating the IF television
               signal to obtain a baseband video and for providing said baseband
18             video signal to a video processing circuit;

19                    an RF converter for re-modulating the video signal output by the video
               processing circuit and outputting an RF modulated signal to an antenna
20             circuit connected between the antenna input terminal and an antenna
               output terminal, said antenna circuit being arrange to receive an RF
21             television signal from said antenna input terminal and the RF
               modulated signal from said RF converter, and to output a converted RF
22             television signal to said output terminal and to the tuner in accordance
               with a control signal; and
23
                      an RF oscillator circuit included in said RF converter for providing a
24             VHF carrier which is modulated by the output of said video processing
               circuit, said oscillator circuit comprising a resonance circuit including
25             at least one coil and a capacitor for controlling an oscillation frequency
               of the RF oscillator and a switch for shifting said oscillation frequency
26             in order to shift from a first VHF carrier frequency to a second VHF
               carrier frequency; and wherein said antenna circuit, said tuner, said IF
27             amplifier, and said RF converter are all accommodated in a shield
               case.
28

                                              42

United States District Court
For the Northern District of California

1   Claim 5 calls for a circuit device according to claim 1 "wherein said tuner, IF amplifier and RF

2   converter are accommodated in a shield case."[13]  In its Claim Construction Order, the court construed

3   the term "a capacitor" as used in clam 1 to mean "one or more capacitors."

4           **B.      Defendants' Summary Judgment Motion**

5           Daewoo asserts that it is entitled to summary judgment of non-infringement on two grounds.

6   First, Daewoo asserts that in the accused products, the antenna circuit does not output a converted

7   RF television signal to the tuner in accordance with a control signal, as required under claims 1 and

8   5.  In fact, Daewoo argues, this limitation, which was added during prosecution, makes no sense

9   because it would give rise to co-channel interference, a result that one of ordinary skill would avoid.

10  Daewoo notes further that the limitation is not addressed at all in the specification – most likely,

11  Daewoo posits, because it was a typographical error.  According to Daewoo, the prosecution history

12  indicates that the applicants intended to add a limitation requiring that the converted RF signal be

13  output to the *antenna circuit* rather than the tuner.  Thus, Daewoo argues, not only do its products

14  not infringe the '218 patent; claim 1 also fails for lack of enablement under 35 U.S.C. § 112 and lack

15  of utility under 35 U.S.C. § 101.

16          Second, Daewoo asserts that the accused products do not contain all the elements of claims 1

17  and 5 because the resonance circuit does not include a switch for switching the oscillation frequency,

18  nor is the switch located in the shield case.

19          Daewoo also argues that neither of the requirements discussed above are met under the

20  doctrine of equivalents.

21          Funai argues that both of the requirements addressed by Daewoo are met in the accused

22  products.  As to the limitation calling for a converted RF signal to be output to the tuner, Funai

23  asserts that one skilled in the art would understand that this must mean a "dramatically attenuated"

24  signal because a full strength signal would – as Daewoo's expert also pointed out – give rise to

25  negative results, including unintended broadcast of the recorded video signal in violation of FCC

26  regulations.  As to the switch requirement, Funai argues that the accused products have a switch as

27  _____

28      [13]  As the "additional" limitation in claim 5 calling for a shield case is also contained in claim
    1, the two claims appear to disclose identical inventions.

United States District Court
For the Northern District of California

1  described in claim 1 and that the claim does not require that the switch be located in the resonant

2  circuit.

3      Funai further argues that both claim limitations are met under the doctrine of equivalents.

4      **C.      Analysis**

5          **1.      Converted RF Signal Output to Tuner**

6              **a.      Literal Infringement**

7      The parties dispute whether the accused products meet the following limitation in claim 1:

8          an RF converter for re-modulating the video signal output by the video
           processing circuit and outputting an RF modulated signal to an antenna
9          circuit connected between the antenna input terminal and an antenna
           output terminal, said antenna circuit being arrange to receive an RF
10         television signal from said antenna input terminal and the RF
           modulated signal from said RF converter, **and to output a converted**
11         **RF television signal to said output terminal and to the tuner in**
           **accordance with a control signal;**

12

13  '218 patent, claim 1 (excerpt).   Daewoo's expert asserts that the accused products do not meet this

14  limitation because the RF television signal that is sent to the output terminal in these products is

15  shorted out to ground, with only a residual signal that cannot be considered an RF television signal

16  making it to the tuner.  Funai's expert asserts that this attenuated signal satisfies the claim limitation.

17  The court concludes that Daewoo is correct.

18      According to Funai's expert, Stephen Bristow, a converted RF signal is output to the tuner in

19  the accused Daewoo products as follows:

20          As shown on DE 031731,[14] the TMI has an antenna circuit connecting
           an antenna input and an antenna output.  The antenna circuit receives
21         an RF signal from the antenna input terminal ANT IN.  The antenna
           circuit also receives the converted RF signal from PIN 15 of RF
22         converter IC1.

23          The IC1 also outputs a control signal at PIN 14 in accordance with the
           input of PIN 6 ("Carrier Off").  Carrier Off on IC1 refers to the
24         toggling of the output of the converted RF television signal at PIN 15.
           When Carrier Off is enabled, IC1 does not output a converted RF
25         signal at PIN 15.  When Carrier Off is not enabled, IC1 does output a
           converted RF signal at  PIN 15.  The control signal at PIN 14 is also

26

27      [14] This is a schematic of one of the two Daewoo products that use the US5 3-in-1 tuner, attached
   as Ex. 1 to the Kang '218 Motion Declaration at 31731 and reproduced in Funai's '218 Opposition at
28   5.

1    conveyed to the antenna circuit. The antenna circuit then conveys the
     output of PIN 15 to the ANT OUT terminal and to the tuner in
2    accordance with the control signal. As shown at DE 031731, the RF
     output (PIN 15) of the IC1 is coupled to the ANT OUT through
3    elements R3, LA4 and C11, C9, D4. The antenna circuit also conveys
     the output of PIN 15 to the input of the tuner module through capacitor
4    C72 in accordance with the control signal through elements: R3, LA 4
     and C11, C9, D4, C7, C8, C6, C5 and R1.

5
     Thus, when the antenna circuit is configured to output the signal from
6    ANT IN, the signal from PIN 15 is not output to ANT OUT, nor is the
     signal from PIN 15 output to the tuner through C72. When the antenna
7    circuit is configured to output the signal at PIN 15, the antenna circuit
     passes a significantly reduced version of the signal from PIN 15 to the
8    ANT IN terminal and to the tuner through C72.

9    Bristow '538, '209, and '218 Opposition Decl., Ex. A (Bristow Expert Report) at 46-47.

10       Daewoo's expert, Martin Sperber, agrees with Funai's expert that the signal to the tuner in

11   the accused products – which Sperber refers to as "inadvertent leakage" – is far from being a full-

12   strength signal:

13          The requirement of claim 1 . . . "and to output a converted RF
            television signal to said output terminal and to the tuner in accordance
14          with a control signal" violates basic RF communications engineering
            practice. Sending the modulated RF signal to the tuner and/or the
15          antenna terminal will produce unacceptable co-channel interference
            when the tuner is receiving the same channel (ch3 or ch4) that the RF
16          modulator is set to. This situation occurs particularly when invention
            is connected to a CATV system because both channel 3 and channel
17          [4] are on the cabel [sic] carriage. The carrier frequency of the RF
            modulator, determined by an LC tuned circuit . . . will generally not be
18          precisely tuned to the same frequency of the incoming desired co-
            channel. The frequency offset will be observed as highly visible beat
19          lines in the video display of the TV set. Further, the FCC specifies and
            limits the amount of signal radiation that can be allowed at the
20          receiver's antenna terminal. In the case of over the air reception, the
            RF modulator's signal will be radiated through the receiving antenna
21          and jam the reception of neighboring TV sets. In the case of a CATV
            system, the RF modulator's signal will be radiated back into the cable
22          system and jam the reception [of] other subscribers on the system.
            Good engineering practice requires that any such inadvertent leakage
23          to either the tuner or the antenna terminal be at least 60 decibels below
            the desired incoming channel carrier level. Daewoo has recognized the
24          basic RF communications engineering practice to avoid interference
            desicribed [sic] above and has included solid state RF shorting
25          switches which are programmed to be enabled when the RF modulator
            is active and are depicted in DE 031731. The schematic references for
26          the shorting network include diode D4, and transistors TR2 and TR3.
            When the RF modulator is active, TR2 and TR3 short the path from
27          the modulator output back to the antenna terminal and the tuner. Also,
            diode D4 is turned on to allow the modulator output to be connected to
28          the ant out terminal. When the RF modulator is inactive, TR2, TR3

45

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

> and diode D4 are turned off to allow the antenna terminal incoming
> signals to loop through the antenna output port.

Declaration of Daniel M. Press in Support of Motion for Partial Summary Judgment on U.S. Patent No. 5,815,218 ("Press '218 Motion Decl."), Ex. 4 (Sperber Expert Report) at 6-7. Sperber goes on to state that he has tested the accused products and confirmed that they meet the requirement discussed above, that is that the leakage to the tuner must be at least 60 decibels below the desired incoming channel carrier level. *Id.* at 8. In particular, Sperber's tests revealed that "the average isolation measured at the carrier frequency is approximately 62 dB." *Id.*

While the experts appear to largely agree on how the accused products work, their ultimate conclusions differ. Sperber specifically addresses Bristow's conclusion regarding infringement as follows:

> Mr. Bristow has drawn a false conclusion of infringement just by
> looking at the circuit connections and not taking into account the
> excellent engineering practice and circuit design functionality meeting
> >60dB isolation. Note that the level of residual RF carrier that is
> represented in the lower trace in the above screen shot is -54 dBmV.
> This level corresponds to a C/N (carrier/noise) ratio of 5dB. The
> actual video content would be well below the noise floor. A viewer of
> a TV set would only see snow on the screen. Therefore, it cannot be
> said that the attenuated carrier constitutes a converted RF television
> signal. Even at a C/N ratio of 30dB, the viewed television picture
> would be quite snowy. The SSTMI US5 tuner also uses similar
> circuitry to isolate any leakage from the RF modulator back to the
> input antenna and the tuner.

*Id.* at 9.

Daewoo also argues that the "residual RF carrier detected at the antenna input terminal" in the accused products may not even be transmitted through the circuitry of the antenna, as required under claim 1, but rather, may be radiated through the airwaves. Daewoo '218 Motion at 7. In particular, Daewoo cites Bristow's deposition testimony in which he testified that he had not tested the accused products to determine whether there would be a detectable signal at the antenna input terminal if the connection in the circuitry of the antenna circuit were broken. *Id.* (citing Press '218 Motion Decl., Ex. 7 (Bristow Depo.) at 183).

The dispute on this issue turns, in large part, on whether the weak signal that both parties agree is transmitted to the tuner in the accused products would be considered to be the "converted RF

United States District Court
For the Northern District of California

1   television signal" referred to in claim 1. Funai asserts that Daewoo's argument is an attempt to

2   improperly limit the meaning of "converted RF television signal" to a "full-strength" signal. Funai

3   '218 Opposition at 11. Funai further asserts that such a reading is not supported by the specification,

4   which "uses signal in many instances" without mentioning or referring to the strength of the signal.

5   *Id.* (noting that the specification refers variously to "a television signal," "the television signal" and

6   "a predetermined television signal"). Notably, however, all of the references in the specification

7   cited by Funai refer to a "*television* signal," as does the claim language itself. Daewoo's expert has

8   testified that the attenuated signal that is sent to the tuner in the accused products is so weak that it

9   would generate nothing but "snow" on a screen and therefore, that one who is skilled in the art would

10  not consider it to be a television signal. Funai has neither disputed Daewoo's factual assertion that

11  the signal would not be sufficient to generate anything but snow on a screen nor pointed to any

12  specific expert testimony explaining why such a weak signal would be considered a *television* signal,

13  as that term has been used in the '218 patent, in light of this lack of functionality. The court

14  concludes, therefore, that the term "converted RF television signal" would be considered by one who

15  is skilled in the art to require a signal sufficient to generate a television image. Because it is

16  undisputed that the signal that goes to the tuner in Daewoo's accused products is not strong enough

17  to generate an image, that signal is not a "converted RF television signal" and Daewoo is entitled to

18  summary judgment of non-infringement on that basis.[15]

19                            **b.    Infringement Under Doctrine of Equivalents**

20       Funai asserts that even if Daewoo's products do not literally infringe, summary judgment of

21  non-infringement should be denied because they infringe under the doctrine of equivalents.

22  Specifically, Funai asserts that the device used in the accused products does substantially the same

23  thing, in the same way, to achieve the same function as the claimed device: the "function of the

24  antenna circuit is to output the converted RF television signal to the antenna output terminal and to

25

26       [15] At oral argument, Funai argued that the words "in accordance with a control signal" in claim
    1 indicate that a "converted RF television signal" can be an attenuated signal because, it asserted, it is
27  the control signal that attenuates the signal under the patent. The court, however, finds nothing in the
    specification or prosecution history indicating that the control signal is used in this way. Accordingly,
28  the court rejects Funai's argument.

                                                47

1 the tuner;" "the way the antenna circuit outputs the converted RF television signal is by using the
2 control signal to determine the output to the tuner and to the antenna output terminal" and the "result
3 is that the antenna circuit outputs the converted RF television signal to the output terminal and to the
4 tuner in accordance with the control signal." Funai '218 Opposition at 19. Funai's argument fails
5 for two reasons.

6 First, Funai's application of the function/way/results test is overly mechanical and incorrect.
7 As a preliminary matter, the function of the limitation at issue is unclear. The specification offers no
8 explanation of this requirement. Moreover, the experts agree that sending a signal of sufficient
9 strength to generate a television image to the tuner violates basic principles of engineering and gives
10 rise to negative results. Yet the ordinary meaning of the claim language imposes such a limitation
11 and this court may not redraft the claim language to avoid this requirement. Further, given that
12 Daewoo's products intentionally short the converted RF signal to ground in order to avoid these
13 negative results, it is difficult to understand how the result could be considered to be substantially the
14 same. In short, the difference between the claimed device and the accused device with respect to this
15 limitation is substantial.

16 Second, the prosecution history gives rise to a presumption of estoppel that Funai has not
17 rebutted. In particular, the relevant claim language, "to output a converted RF television signal to
18 said output terminal and to the tuner in accordance with a control signal," was added during
19 prosecution following a rejection of the claim on the basis that it contained matter that was not
20 explained in the specification, in violation of 35 U.S.C. § 112, first paragraph (a "new matter
21 rejection"). *See* Press'218 Motion Decl., Ex. 6 (File Wrapper) at FD 01215 (December 22, 1997
22 Advisory Action rejecting claims 1-4 and 6 under 35 U.S.C. § 112, first paragraph), 01249
23 (amending claim 1 to add quoted language and stating that amendment was, in part, to overcome
24 rejection under 35 U.S.C. § 112, first paragraph). As discussed above, an amendment to overcome
25 the examiner's rejection gives rise to a presumption of estoppel under *Festo*, shifting the burden to
26 Funai to overcome that presumption. Funai, however, has pointed to nothing in the prosecution
27 history that rebuts the *Festo* presumption.

28

1   Therefore, the court holds, as a matter of law, that Funai is precluded from relying on the

2   doctrine of equivalents with respect to this claim limitation.

### D. Conclusion

4   For the reasons stated above, the Court GRANTS Defendants' Summary Judgment Motion

5   ('218 Patent) and finds that the accused devices do not infringe the '218 patent, either literally or

6   under the doctrine of equivalents.

### IX. THE '332 PATENT

### A. Background

9   The '332 patent is entitled "Image Display Device Having TV and Video Devices." It was

10  issued on August 21, 2001, from a reissue application filed June 18, 1998, seeking reissue of United

11  States Patent No. 5,654,778 ("the '778 patent"). The '778 patent, in turn, was based on an

12  application filed June 1, 1995, which claimed priority to two Japanese patent applications, filed

13  November 6, 1991, and February 28, 1992. During reissue, claim 1 of the '778 patent was amended

14  to add the limitation "with substantially no magnetic shielding between the high frequency

15  transformer and the video head cylinder." In addition, claim 2 of the '778 patent was cancelled and

16  claims 5-13 of the '332 patent were added during reissue. As the court explained in its Claim

17  Construction Order, the '332 patent "addresses the problem of magnetic field produced by the

18  transformer interfering with the video head [by teaching] an orientation between the transformer and

19  video head that reduces the interference caused by the magnetic field." Claim Construction Order at

20  3. The court explained, "this reduces the interference caused by the magnetic field." *Id.*

21  In its Claim Construction Order, the court construed the term "magnetic shielding" as it

22  appears in claims 1, 9, and 12. The court construed the term as follows: "Magnetic shielding is a

23  structure that acts to redirect magnetic flux, thereby reducing magnetic flux at an electronic

24  component that is necessary to the component's effective operation." Claim Construction Order at

25  20.

26  The court further held that "[t]he term 'magnetic shielding' cannot be interpreted to include

27  'eddy current damping.'" *Id.* at 19. In reaching this conclusion, the court reasoned as follows:

28

49

1

2

3

4

5

6

7

8

> Transformers used in VCRs can be placed into two categories. The first category of transformer operates at or about line voltage frequency, roughly 60 Hz. The second category of transformer operates at a much higher frequency, in the 100 kHz range. Although eddy current damping has commonly been utilized to shield the video head from magnetic field at low frequency transformers, it is not generally used at higher frequency due to reduced effectiveness. The claims of the patent, however, only disclose magnetic shielding of "high frequency transformers." '332 patent col. 4:3, 5:58, 6:29-30, and 6:57. Because one of ordinary skill in the art would interpret "high frequency transformer" to include transformers in the 100 kHz range where eddy current damping for magnetic shielding is ineffective, the ordinary meaning of "magnetic shielding" to one of skill in the art would not encompass "eddy current damping."

9  *Id.* Finally, the court rejected Funai's argument that the term "magnetic shielding" requires an

10  "enclosure." *Id.* at 19.

11  Funai asserts that Defendants' devices infringe claims 1, 6, 7, and 11, as well as the claims

12  that are dependent on those claims.

13  ### B.   Issues Raised in the Motions

14  The parties seek summary judgment on the questions of both infringement and invalidity.

15  ### 1.   Infringement

16  Daewoo seeks summary judgment of non-infringement on the basis of several claim

17  limitations of the '332 patent that they assert are not met in the accused Daewoo products. First,

18  Daewoo asserts that none of the accused products meet the limitations in claims 1 and 6, requiring a

19  transformer with no magnetic shielding between the transformer and the video head cylinder.

20  Daewoo '332 Motion at 8 (citing to Declaration of Daniel M. Press in Support of Motion for Partial

21  Summary Judgment on U.S. Patent No. RE37,332 ("Press '332 Motion Decl."), Ex. 4 (Rice Rebuttal

22  Report) at 25-26). Rather, Daewoo argues that its accused products have magnetic shielding in

23  them, namely, the video head, the front loading drive motor, the chassis side walls and the copper

24  shield ring.[16] *Id.*

25

26

_____

27  [16] Although Daewoo does not specifically reference the video head in the text of its motion, it points to a figure from Rice's expert report that identifies the video head as one of four components that constitute magnetic shielding in the accused products. Daewoo '332 Motion at 8 (citing Press '332

28  Motion Decl., Ex. 4 (Rice Rebuttal Report) at 25-26).

United States District Court

For the Northern District of California

1   Second, Daewoo argues that the accused products do not infringe because they do not contain
2   a circuit board with a power supplying area and "another area," as required in claims 1, 6, 7, and 11.
3   Daewoo '332 Motion at 16. In particular, with respect to the DVD/VCR combination products,
4   Daewoo asserts that these products contain a "power-supply only" circuit board that does not
5   accomplish the objective stated in the '332 patent of increasing the density of components on the
6   circuit boards to reduce the number of circuit boards. *Id.* As to the stand-alone VCRs, Daewoo
7   asserts that there is not a circuit board with a power supply and "another area" because the power
8   supply components are dispersed throughout the circuit board. *Id.*

9   Third, Daewoo asserts that the accused products do not meet the requirement in claims 7 and
10  11 that the transformer must be oriented so that the video head cylinder is "substantially isolated
11  from any noise generated by said transformer primarily by virtue of the orientation of said
12  transformer with respect to said video head cylinder." *Id.* at 15-16. In support of this position,
13  Daewoo asserts that in the accused products, the isolation of transformer noise is not accomplished
14  "primarily" through the orientation of the transformer but rather, as a result of the distance between
15  the transformer and the video head cylinder, along with the magnetic shielding achieved through the
16  components listed above, in particular, the loading drive motor, the chassis side walls and the copper
17  shield ring. *Id.* at 10. Daewoo also points to test results that it asserts show that in the accused
18  products, the orientation of the transformer makes no difference in noise at the video head. *Id.* at 11.

19  Finally, Daewoo argues that its products do not infringe the '332 patent under the doctrine of
20  equivalents, asserting that the limitations addressed above were added to overcome prior art and,
21  therefore, the doctrine of prosecution history estoppel applies. *Id.* at 16-17. Daewoo further asserts
22  that the doctrine of equivalents does not apply because the accused devices do not perform
23  substantially the same function in substantially the same way as the claimed invention.

24  Funai asserts that Daewoo's arguments regarding literal infringement fail because it has
25  presented substantial evidence of infringement. Further, it asserts that it is entitled to summary
26  judgment in its favor that Daewoo's stand-alone VCR's manufactured before June 30, 2004 – when
27  horizontally-oriented circuit boards were used – and its DVD/VCR combination products, infringe

28

51

1 claim 1 the '332 patent as a matter of law.[17] Funai does not address Daewoo's argument that there is

2 no infringement under the doctrine of equivalents as a matter of law.[18]

### 2. Invalidity

4 Daewoo asserts that the '332 patent is invalid because the invention claimed in it is obvious

5 in light of the prior art. In particular, Daewoo points to the Panasonic PV-1230 VCR and the United

6 States Patent No. 5,094,513 ("the Fukuda patent"). Daewoo '332 Motion at 18-31. According to

7 Daewoo, the PV-1230 meets all the '332 limitations except the requirement of substantially no

8 magnetic shielding in claims 1 and 6 and the requirement the video head be "substantially isolated"

9 from transformer noise by virtue of its orientation. *Id.* at 18-19. These elements, however, were

10 taught in the Fukuda patent. *Id.* at 20. Although the PTO considered this same prior art during the

11 reissue proceeding, Daewoo asserts that in light of the Supreme Court's subsequent decision in *KSR*

12 *Int'l, Co. v. Teleflex, Inc.*, – U.S. – , 127 S. Ct. 1727, 1745 (2007), the PTO applied the wrong

13 standard in determining whether the claims of the '332 patent were obvious. Daewoo '332 Reply at

14 1-6.

15 Funai argues that the prior art cited by Daewoo does not render the '332 patent obvious

16 because the PV-1230 teaches away from removing the magnetic shielding and there would be no

17 motivation to combine the teaching of the Fukuda patent with the PV-1230. Funai '332 Opposition

18 at 9. Funai also asserts that neither the PV-1230 nor Fukuda disclose the core gap orientation that is

19 called for in claim 1 of the '332 patent and thus, these references do not support a conclusion of

20 obviousness. *Id.* at 10-11. Finally, Funai asserts that evidence of secondary considerations precludes

21 summary judgment of obviousness. *Id.* at 11-12.

22

23

24 [17] Funai concedes that as of June 30, 2004, when Daewoo altered the design of its stand-alone VCRs to use a vertically oriented circuit board rather than a horizontal circuit board, Daewoo's stand-

25 alone VCRs no longer infringed the '332 patent. Although Funai previously alleged that Daewoo's TV/VCR combination products also infringed the '332 patent, Funai no longer accuses those products

26 of infringement

27 [18] Because Funai has not opposed Daewoo's request for summary judgment with respect to infringement of the '332 patent under the doctrine of equivalents, the court concludes that Funai has

28 abandoned that theory of liability and therefore GRANTS summary judgment in favor of Daewoo on that issue.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

C.   **Analysis**

1.   **Magnetic Shielding**

Daewoo asserts that its accused products do not infringe the '332 patent because they have magnetic shielding, whereas claims 1 and 6 of the '332 patent call for no magnetic shielding. Daewoo's expert explains his conclusion as to both the VCR/DVD combination products and the stand-alone VCRs as follows:

> The Court has construed the term "magnetic shielding" to mean "a structure that acts to redirect magnetic flux, thereby reducing magnetic flux at an electronic component that is necessary to the component's effective operation." The Court specifically did not require the "magnetic shielding" to be a complete enclosure of the protected component.
>
> In line with the Court's construction of the term "magnetic shielding," the components identified in [Figures 5 and 6] will serve to redirect magnetic flux thereby reducing the magnetic flux at the video head. In addition, the high frequency transformer includes a copper shield ring covering the core gap that will also serve to redirect the magnetic flux and thus function as "magnetic shielding."

Press '332 Motion Decl., Ex. 4 (Rebuttal Report of Dr. James Rice Submitted by Daewoo Electronics Corporation Et Al ("Rice Rebuttal Report")) at 26. In Figures 5 and 6, which depict the VCR/DVD and stand-alone VCR products, respectively, Dr. Rice has identified the video head, the drive motor, the chassis side wall, and the high frequency transformer as components that are magnetic shielding. Similarly, at his deposition, Daewoo expert Dong Han Kang testified that a "lot of . . . components having high permeability are located between the . . . video header and the high frequency transformer" and these are magnetic shielding. Ojha Motions Decl., Ex. X (Dong Han Kang April 17, 2007 Depo.) at 65-66.

In its briefs, Funai does not cite to any testimony by its own experts in support of its assertion that the accused products do not contain magnetic shielding. However, in a report by Funai expert Kazerooni – provided to the Court by Daewoo – the following reasoning is offered:

> I am aware that Daewoo has directed attention to things it considers as magnetic shielding. Based upon the Court's construction of the claim, a structure would have to be positioned "between" the transformer and video head cylinder to act as magnetic shielding. My understanding of between is informed by the disclosure in the '332 Patent that illustrates the magnetic shielding that the invention obviates. In particular, it is a plate structure, i.e., uniform, without openings, that extends across an

53

1
2
3
4
5

> entire area where the magnetic flux would otherwise pass through. Reviewing the geometry of the accused devices, it is my opinion that the only devices between the transformer and the video head cylinder do not have shielding properties as that term is used in the patent and as defined by the court. In particular, the cassette holder, VCR cover and various motor components pointed out by Daewoo are not magnetic shielding within the Court's definition and do not lie between the transformer and the video head cylinder as required by the claims and described in the patent. . . .

6 | Press '332 Motion Decl., Ex. 3 (Kazerooni Expert Report) at 24-25.

7

### a. Video Head

8    In his expert report, Daewoo expert Dr. Rice identified the video head as magnetic shielding

9 | in the accused products. Press '332 Motion Decl., Ex. 4 (Rice Rebuttal Report) at 25-26. At oral

10 | argument, however, Daewoo stipulated that it is not asserting that the video head – or the video head

11 | drum to which Dr. Rice was likely referring – is magnetic shielding. In particular, counsel conceded

12 | that the video head drum is not "between the high frequency transformer and the video head

13 | cylinder" as required under claim 1. Accordingly, Daewoo is not entitled to summary judgment of

14 | noninfringement on this question.

15

### b. Chassis Side Walls

16    Dr. Rice states that the chassis side walls are magnetic shielding under the court's definition

17 | of that term. Press '332 Motion Decl., Ex. 4 (Rice Rebuttal Report) at 25-26. Funai argues,

18 | however, that the chassis side walls cannot be "magnetic shielding" because one of the preferred

19 | embodiments, shown in Figure 3 of the '332 patent, includes a chassis and a claim construction that

20 | excludes a preferred embodiment is "rarely, if ever, correct." Funai '332 Opposition at 14 (citing

21 | *Pfizer, Inc. v. Tera Pharms., U.S.A., Inc.*, 429 F.3d 1364, 1374 (Fed. Cir. 2008)). Funai also points

22 | out that the '332 patent only refers to shield plates 7 and 18 as magnetic shielding. *Id.* at 13 (citing

23 | '332 patent, col. 1:34 & 3:19).[19]

24    Daewoo responds that the '332 patent does not specify what the chassis in Figure 3 is made

25 | of and, therefore, the preferred embodiment would not be excluded so long as the chassis were made

26

27
28

---

[19] Funai also asserts that during patent prosecution, the inventors referred to shield plates in the PV-1230 as "magnetic shielding." However, Funai does not provide a citation in support of this assertion. Funai does not assert that the inventors ever stated during prosecution that shield plates were the *exclusive* structure that could be magnetic shielding.

1 of non-ferrous material with low permeability or plastic. Such materials, according to Daewoo,
2 would not redirect the magnetic flux and therefore would not be magnetic shielding.

3 To the extent that Funai argues that the chassis side walls cannot be magnetic shielding under
4 the '332 patent as a matter of claim construction, this is an issue of law and, therefore, is
5 appropriately decided by the court. The court rejects Funai's assertion that the chassis side walls
6 cannot be magnetic shielding. First, to the extent Funai suggests that shield plates are the *only*
7 structure that can constitute magnetic shielding under the '332 patent, the court rejects that assertion.
8 While Funai has demonstrated that shield plates are used for magnetic shielding in some of the
9 preferred embodiments in the '332 patent, it has not demonstrated – either through cites the patent or
10 the prosecution history – that the term "magnetic shielding" is *limited to* shield plates. Funai's
11 proposed construction would improperly limit the claims based on the preferred embodiments.
12 Furthermore, to the extent that Funai's argument amounts to an effort to add a new limitation to the
13 court's construction of the term "magnetic shielding," the court declines to revisit that issue.

14 Second, the fact that one of the preferred embodiments has a chassis does not persuade the
15 court that chassis side walls cannot be magnetic shielding, given that the '332 patent does not specify
16 what the chassis should be made of. As a chassis made of some materials would not fall within the
17 court's definition of "magnetic shielding," Figure 3 does not require that the court exclude chassis
18 side walls from its construction of the term "magnetic shielding."

19 Having determined that the patent does not preclude the possibility that the chassis side walls
20 in the accused products are magnetic shielding, the court turns to the factual question of whether the
21 chassis side walls are, in fact, magnetic shielding under the court's construction of that term in the
22 Claim Construction Order. Daewoo's expert asserts that they are. Funai does not address this
23 factual question or point to any evidence in support of its assertion that this component is not
24 magnetic shielding. Therefore, Daewoo is entitled to summary judgment on this issue.

25 **c. Front Loading Drive Motor**

26 Dr. Rice also takes the position that the drive motor is made of permeable metal that redirects
27 magnetic flux and, therefore, is magnetic shielding. Funai asserts that "[n]o person of ordinary skill
28

United States District Court
For the Northern District of California

1 in the art would ever consider the LC motor housing as magnetic shielding." Funai '332 Opposition.

2 In support of this position, Funai continues:

> 3 The LC motor housing itself is but a small piece of permeable metal
> between the transformer and the video head cylinder. Given the
> 4 elliptical nature of the magnetic force lines and small size of the
> housing, among other factors, the housing would not act to reduce
> 5 magnetic flux at the video head cylinder.

6 Funai '332 Opposition at 14-15. Funai does not, however, cite any expert testimony in support of

7 these assertions by counsel.

8 Instead of citing testimony by its own experts that the drive motor is *not* magnetic shielding,

9 Funai argues that Daewoo has not provided any convincing evidence that the drive motor *is* magnetic

10 shielding. In particular, Funai points to testimony by Daewoo's expert, Dong Han Kang, in which he

11 conceded that he had not "directly" tested the accused products to determine the magnitude of any

12 magnetic shielding that is contributed by the motor or chassis." Ojha Motions Decl., Ex. X (April

13 17, 2007 Kang Depo.) at 87. Instead, Kang testified that he conducted other tests from which he

14 could "infer" that "the motor, having high permeability, could act as shielding." *Id.* at 88.

15 The court concludes that Daewoo is entitled to summary judgment on this issue. As noted

16 above, on summary judgment, Daewoo's burden is satisfied if it points to an absence of evidence to

17 support the nonmoving party's claim. Having presented evidence in the form of Dr. Rice's expert

18 testimony that the drive motor constitutes magnetic shielding, the burden shifted to Funai to present

19 evidence that it does not. Funai presented no such evidence. As a result, Daewoo has met its burden

20 on summary judgment.

21 ### d. Copper Shield Rings

22 Daewoo asserts that the copper shield rings are "magnetic shielding" even though it does not

23 dispute that any reduction in magnetic flux the copper shield rings create results from "eddy current

24 damping," which was expressly excluded from the definition of "magnetic shielding" in the Claim

25 Construction Order. Daewoo '332 Opposition at 1-5. According to Daewoo, the court was "simply

26 . . . wrong" when it excluded eddy current damping from magnetic shielding in its Claim

27 Construction Order.

28

56

1   As Daewoo has offered no explanation for its failure to bring a motion to reconsider the

2   court's Claim Construction Order on this point, the court declines to revisit the issue at this stage of

3   the case. Accordingly, Daewoo's argument that the copper shield rings in its accused products are

4   magnetic shielding fails as a matter of law.

### 2.   Circuit Board with Power Supply and "Another Area"; Chassis "Parallel to and Above" the Power Supply Circuit Board

7   In its motion, Daewoo asserts that neither the DVD/VCR accused products nor the stand-

8   alone VCR accused products meet the limitation contained in all of the asserted claims of the '332

9   patent requiring a circuit board with "another area." Daewoo '332 Motion at 6-7. In support of this

10  assertion, Daewoo cites the following statement by its expert, Dong Han Kang:

> 4.      The circuit board in the accused DVD/VCR Combo products
> which includes "said power supplying area" only includes "said power
> supplying area" and does not include "another area" as required by
> Claims 1, 6, 7, and 11 of the '332 Patent. The separate power-supply-
> only circuit board installed in the DVD/VCR Combo products is for
> ease of manufacturing assembly, and for cross-compatability across
> multiple DVD/VCR Combo models, contrary to the stated benefits of
> the '332 patent of *reducing* the number of circuit boards to ease
> assembly.
>
> 5.      Attached hereto as Exhibit 2 is a true and correct copy of the
> PCB and circuit schematics from service manual VT7D5NTEF0 for
> Daewoo stand-alone T-Mecha VCRs, annotated to show the power
> supply components, and showing that there is no circuit board area
> other than the power supplying area because power supply components
> are dispersed throughout the circuit board.

20  Kang '332 Motion Decl., ¶¶ 4-5. Kang provides schematics of the T-Mecha VCRs in support of his

21  position. *Id.*, Ex. 2.

### a.   The DVD/VCR Combination Products

23  The disagreement regarding Daewoo and Funai with respect to the DVD/VCR combination

24  products turns on two claim construction issues. First, does the language of claim 1 cover a device

25  in which the "power supplying area" is on a different circuit board than the area referred to as

**United States District Court**
For the Northern District of California

1  "another area." Second, what does the term "parallel to and above" mean as it is used in the

2  limitation requiring that the chassis be installed "parallel to above said at least one circuit board."[20]

3  With respect to the first issue, Daewoo asserts that the power supplying area must be on the

4  *same* circuit board as "another area." Daewoo '332 Opposition at 7. Funai, on the other hand, points

5  to the reference to "at least one circuit board" in support of its assertion that the claim allows for the

6  power supply to be on a separate circuit board from "another area." In particular, Funai interprets the

7  claim as requiring only that "the one or more circuit boards on which there is 'a power supplying

8  area' is the same set of one or more circuit boards that must include 'another area.'" Funai '332

9  Reply at 6 n.2. Funai's position on this point is supported by case law holding that "at least one" is

10 usually construed as "one or more." *See Biagro Western Sales, Inc. v. Grow More, Inc.*, 423 F.3d

11 1296, 1304 (Fed. Cir. 2005).

12 On the other hand, Daewoo cites the prosecution history of the original '778 patent, arguing

13 that the applicant disavowed a construction of claim 1 to the extent that it might be construed to

14 allow use of a separate, power-supply-only circuit board. In particular, in response to a rejection of

15 claims 1-4 of the '778 application based United State Patent No. 5,023,726 ("Campisi"), the

16 applicant attempted to overcome the rejection on the basis that Campisi disclosed a "completely

17 separate power supply board." Daewoo '332 Opposition at 8 (citing Declaration of Daniel M. Press

United States District Court
For the Northern District of California

---

[20] Claim 1 reads, in its entirety, as follows:

1. A video device comprising:

at least one circuit board;

a power supply device installed on a power supplying area of said at least one circuit board, said at least one circuit board including another area, other than said power supplying area, provided thereon;

a chassis on which parts of said video device are installed parallel to and above said at least one circuit board, aid parts of said video device including at least a video head cylinder; and

a high frequency transformer, provided with a core having primary and secondary windings and a core gap, installed on said power supplying area with substantially no magnetic shielding between the high frequency transformer and the video head cylinder, said core gap including a plane, the plane including said core gap being parallel to at least one circuit board.

58

1  in Support of Opposition of DEC and DEAM to Plaintiff's Motion for Summary Judgment on U.S.

2  Patent No. RE 37,332 ("Press '332 Opposition Decl."), Ex. 5 at 103-04, 115).

3      It is well-established that "the prosecution history (or file wrapper) limits the interpretation of

4  claims so as to exclude any interpretation that may have been disclaimed or disavowed during

5  prosecution in order to obtain claim allowance." *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d

6  448, 452 (Fed. Cir. 1985). Here, the original '778 application had four claims. Application claim 1

7  recited:

8          An image display device having a casing in which a television device
           and a video device are enclosed, comprising:
9
           a main circuit board having a first area for installing electronic parts of
10         an electron beam controlling circuit for a CRT and a power supply
           circuit for said television device and electronic parts of a power supply
11         circuit for said video device, and a second area for installing electronic
           parts of said television device except for said electron beam controlling
12         circuit and said power supply circuit for said television device and
           electronic parts of said video device except for said power supply
13         circuit for said video device; and terminals for commercial AC power
           source and terminals for said electron beam controlling circuit for CRT
14         provided within said first area of said main circuit device.

15  Press '332 Opposition Decl., Ex. 5, Paper 1. Application claims 2-4 were dependent on claim 1.

16  The patent examiner rejected these claims in part on the basis that the "[t]he separation of the power

17  supply components from the other components is taught by Campisi." *Id.*, Paper 10 at 2. The

18  applicants responded that Campisi did not render obvious claims 1-4 of the '778 patent because it

19  had "a completely separate power supply board." *Id.*, Paper 12 at 3. The examiner found this

20  reasoning unpersuasive, however, stating that:

21          [i]n view of the suggestion of Campisi that the power supply
            components may be separated from the other components on a unitary
22          chassis to facilitate ease in manufacture, it would have been obvious
            for one of ordinary skill in the art to combine the teachings of
23          Applicant's admitted prior art and Campisi in order to provide separate
            areas of a circuit board layout for power supply components and other
24          components of the television and video devices.

25   *Id.*, Paper 14 at 3. The applicant attempted to amend the original claims of the '778 application to

26  overcome this rejection, but the amendments were rejected. Ultimately, application claims 1-4 were

27  cancelled and the applicant submitted several new claims.

28

59

United States District Court
For the Northern District of California

1    Daewoo's prosecution history argument is not persuasive because it has failed to demonstrate

2  that the statements made by the applicant resulted in allowance of the claim at issue. Instead, the

3  application claims with respect to which the relevant distinction was drawn were cancelled. Under

4  these circumstances, the court concludes that the applicant did not disavow a construction of claim 1

5  of the '332 patent that would exclude devices with a separate power-supply-only circuit board.

6  Therefore, based on the language of the claim alone, the court concludes that Funai is correct that

7  "another area" need not be on the same circuit board as the "power supplying area."

8    Daewoo, however, asserts that in the accused DVD/VCR devices the chassis is not "parallel

9  to and above" the circuit board with the power supply, including the transformer, as is also required

10  under all the asserted claims of the '332 patent. Daewoo '332 Opposition at 8. Daewoo explains

11  that in its combination devices, "the chassis is above the 'main' circuit board while the power supply

12  circuit board is located to the side, behind the DVD player component. *Id.* Daewoo's expert

13  explains its position as follows:

14        Figure 4 shown below [and reproduced in Daewoo's '332 Motion at 6]
          provides a view of a typical DVD Combo device. Figure 4 has been
15        annotated to show the subject circuit board and power supply
          components mounted on said circuit board. The subject circuit board
16        which includes the "power supplying area" is designated in the figure
          as the "first circuit board." A second separate circuit board is also
17        shown. The chassis supporting the video head cylinder is mounted on
          this second circuit board.

18

19        . . .

20        As illustrated in Figure 4 shown above, the subject "chassis" is
          installed parallel and above the second circuit board not the first circuit
21        board shown in Figure 4 and identified earlier as the "said at least one
          circuit board" of the subject limitation.

22  Press '332 Motion Decl., Ex. 4 (Rice Rebuttal Report) at 23-25.

23    Funai does not dispute that the asserted claims requires that the chassis be "parallel to and

24  above" the circuit board with the power supply. Nor does it dispute that the power supply circuit

25  board is to the side of the chassis in the accused devices. Rather, it asserts that the location of the

26  chassis in the accused combination products satisfies this requirement because the chassis is "higher

27  or vertically up from" – and thus, above – " the power supplying circuit board." Funai '332 Reply at

28

7.   According to Funai, the chassis need not be "directly above" or "over" the power supplying circuit board to be "above." *Id.*

The court concludes that Funai's argument fails as a matter of law. The common-sense meaning of the word "above" requires that the chassis must be at least partially over the circuit board containing the power supply. Nor is there is any indication that the inventors endowed the word with a special meaning. To the contrary, all of the figures of the patent are consistent with Daewoo's position. Because the chassis is not above the power supply circuit board in the DVD/VCR combination products, Daewoo is entitled to summary judgment of non-infringement as to these products.

### b.   VCR Stand-Alone Products

As noted above, Daewoo argues a circuit board cannot have a "power supplying area" and "another area" where the power supply components are distributed throughout the circuit board, as is the case in its VCR stand-alone products. In support of this contention, Daewoo provides schematics of its accused VCRs, which its expert asserts show that the power supply components are not in a separate area. *See* Kang '332 Motion Decl., Ex. 2.

Funai does not appear to disagree with Daewoo that claim 1 requires that the power supply components be contained in a separate area. Nor does it provide any expert testimony explaining why the schematics offered by Funai's expert do not show what Daewoo says they show. Instead, Funai points to the report of its expert, Kazerooni, stating generally that "it is evident from the figures in the Daewoo service manuals and by visual inspection [that] the accused products each contain a device for receiving power from an electrical outlet installed on a circuit board [and that] [i]t is in a different area of the circuit board from other areas." Ojha Motions Decl., Ex. J (Kazerooni Report) at 23. At his deposition, Kazerooni testified that "any reasonable design" locates the power supplying components in one area. Press '332 Motion Decl., Ex. 6 (Kazerooni Depo.) at 210.

The court finds that the experts' testimony does not provide a sufficient basis to draw any conclusions on this question as a matter of law. Rather, a fact question remains as to whether this claim limitation is met.

1

2

### 3. Video Head Cylinder Isolated from Transformer Noise "Primarily by Virtue" of Transformer Orientation

3   Daewoo argues that its products do not infringe the '332 patent because they do not meet the

4   limitation contained in claims 7 and 11 requiring that the video head cylinder must be "substantially

5   isolated from any noise generated by said transformer primarily by virtue of the orientation of said

6   transformer with respect to said video head cylinder." Daewoo '332 Motion at 8-11. Daewoo's

7   expert explains this conclusion as follows:

8           [T]he accused Daewoo devices include a number of components which
            meet the Court's construction for the term "magnetic shield." Because
9           of the presence of this shielding, the video head is isolated from the
            effect of any noise generated by the transformer. The orientation of the
10          transformer will not primarily serve to accomplish this isolation.

11          The isolation of the video head from noise generated in the accused
            Daewoo device is produced by the combined effects of several
12          features; the shielding components identified above, the basic distance
            between the transformer and the video head, and the shield ring
13          included on the transformer.

14  Press '332 Motion Decl., Ex. 4 (Rice Rebuttal Report) at 40-41. Daewoo also points to test results

15  that it asserts show that the orientation of the transformer makes "no difference on video or audio

16  noise." Kang '332 Motion Decl., ¶ 7 & Ex. 4.

17          In its Opposition, Funai offers no meaningful response to Daewoo's arguments. Rather,

18  Funai merely asserts, without citing any evidence of its own, that Daewoo has not "presented any

19  evidence that the video head cylinder is not substantially isolated from any noise generated by the

20  high frequency transformer by virtue of the orientation of the transformer with respect to the video

21  head." Funai '332 Opposition at 18. The only evidence the court finds in the present record that

22  might support Funai's position is the Kazerooni Report. *See* Ojha Motions Decl., Ex. J. at 25-26. In

23  that report, Kazerooni opines that "the orientation of the transformer with respect to the video head

24  cylinder in the accused products serves to isolate the video head cylinder from noise generated by the

25  transformer." *Id.* at 26. Kazerooni does not, however, address the evidence cited by Daewoo that

26  this orientation is not the *primary* source of isolation because of other factors, including distance and

27  magnetic shielding.

28

1    Because Funai has not presented *any* evidence demonstrating that there is a factual dispute
2    appropriate for trial, and in light of the fact that it is Funai's burden to establish infringement, the
3    court concludes that Daewoo is entitled to summary judgment of non-infringement of claims 7-13 as
4    to all accused products on this basis.

**D.      Conclusion**

6    Defendants' Summary Judgment Motion ('332 Patent) is GRANTED in favor of Daewoo on
7    the question of infringement on the grounds that the accused devices do not infringe the '332 patent,
8    either literally or under the doctrine of equivalents, as a matter of law. Funai's summary judgment
9    motion is DENIED with respect to the question of infringement. Because the court finds that the
10   accused products do not infringe the '332 patent, the court does not reach Defendants' request for
11   summary judgment of invalidity or Plaintiff's request for summary judgment of no invalidity as to
12   the '332 patent.

13   **X.      THE '538 PATENT**

14   **A.      Background**

15   The '538 Patent is entitled "Biasing/Erasing Oscillation Circuit for Magnetic Tape Recording
16   Apparatus." The invention described in the '538 patent relates to the magnetic heads that are used in
17   VCRs to record, play, and erase the video information stored on the magnetic tape in the video
18   cassette. *See* '538 Patent, col. 1:15-17, 30-40 & fig1. Magnetic heads use electrical coils to detect
19   magnetic information during reading and playback and to transmit a signal that erases the
20   information stored on the magnetic tape. In the prior art, the signal that erases the information was
21   generated by a separate transformer. *See* Bristow'538, '209, and '218 Opposition Decl., Ex. A
22   (Expert Report of Stephen Bristow Regarding Infringement of United States Patent Nos. 6,064,538,
23   5,815,218 and 5,987,209 ("Bristow Expert Report")) at 6. The '538 invention eliminates the need
24   for such a transformer, however, and thus reduces the complexity and cost of VCRs, by using the
25   electrical coils that are used to detect information and transmit the signal that erases information for
26   the additional purpose of *generating* the signal that erases information on the magnetic tape. *See*
27   Claim Construction Order at 2.

28

United States District Court
For the Northern District of California

1    The '538 patent contains six claims. Funai asserts that the accused products infringe, both

2  literally and under the doctrine of equivalents, all the claims of the '538 patent except claim 2.

3    In the Claim Construction Order, the court construed three terms used in the claims of the

4  '538 patent:

| Term | Court Construction |
|------|--------------------|
| "connected" (claims 1, 5 and 6) | "physically connected to provide an electrical path between two points, either directly or through intervening electronic components." |
| "biasing means providing a bias voltage to said base" (claims 5 and 6) | means plus function claim; function is "providing a bias voltage to said base;" corresponding structure is "a resistor" and its equivalents. |
| "series junction point at least between said linear record erasing head and one of the entire-width erasing head and an inductive element" (claim 1) | "a point on said series circuit between (1) the linear record erasing head and the entire-width erasing head, (2) the linear record erasing head and an inductance element, or (3) the linear record erasing head and both the entire-width erasing head and an inductance element." |

    Funai asserts that Daewoo's accused devices infringe claims 1 and 3-6 of the '538 patent.

**B.    Defendants' Summary Judgment Motion**

    Daewoo seeks summary judgment of non-infringement on the '538 patent. Pointing to a

simplified schematic of the oscillator circuit used in the accused products, *see* Declaration of Daniel

M. Press in Support of Motion for Partial Summary Judgment on U.S. Patent No. 6,064,538 ("Press

'538 Motion Decl."), Ex. 4 (Expert Report of Martin Sperber ("Sperber Report")) at 16, Daewoo

asserts that these products do not meet the limitations of the asserted claims for three reasons. First,

in the accused products, inductor L202 is not "in series" with full-erase ("FE") head P201 and audio-

linear erase ("AE") head P202, as required under claims 1 and 6. Second, Daewoo's accused

products do not have a "series junction point" connected between the EA and FE heads, as required

under claim 5. Third, Daewoo's products do not have a biasing means that provides a "bias voltage

to said base," as required under all the asserted claims.

64

1    Funai does not dispute that the schematics of the accused products used by Daewoo

2    accurately represent the circuitry at issue.  Rather, it asserts that Daewoo's arguments rest on

3    improper construction of two terms that were not addressed in the court's Claim Construction Order,

4    "series circuit" and "bias resistor."  When these terms are construed properly, Funai argues, it

5    becomes clear that the accused products do, in fact, infringe the asserted claims of the '538 patent.

        **C.    Analysis**

               **1.    "Series Circuit"**

8    Claim One describes a biasing/erasing oscillator comprising several components, including

9    "a series circuit connecting in series through a series junction point at least between said linear

10   record erasing head and one of said entire-width erasing head and an inductance element.  '538

11   patent, claim 1.  Although the court has construed the phrase that begins with the words "series

12   junction point" (see above), it has not construed the term "series circuit."

13   According to Funai, a "series circuit" is defined as "one 'whose components are, in effect

14   connected in a string, *i.e.*, end-to-end.'"  Bristow '538, '209, and '218 Oppositions Decl., Ex. A

15   (Bristow Expert Report) at 12 (quoting The Illustrated Dictionary of Electronics, Stan Gibilisco, Tab

16   Books, 6th Ed. 1994); *see also* Ojha Decl. (Funai '538, '209 and '218 Opposition), Ex. 11 (excerpt

17   from The Illustrated Dictionary of Electronics including definition of "series circuit").  Funai argues

18   that this limitation is satisfied in the accused products by L202, P202 (labeled "AE Head") and P201

19   (labeled "FE" Head"), depicted in the simplified schematic.  *See* Bristow '538, '209, and '218

20   Opposition Decl., Ex. A  (Bristow Expert Report) at 11-12.  In particular, Bristow asserts that P202

21   is the "linear record erasing head," that P201 is the "entire width erasing head," that L202 is the

22   "inductance element" and that these features are arranged "end-to-end" to form a "series circuit."  *Id.*

23   at 12.  Further, according to Bristow, the simplified schematic shows that the series circuit connects

24   through a "series junction point," which is the intersection of the connection between P201 and P202

25   and the connection that leads from Q202 to R231.  *Id.*

26   Daewoo does not dispute that the elements identified by Funai in the simplified schematic of

27   its accused products are connected end-to-end.  However, it disagrees with Funai that these elements

28   make up a series circuit.  Daewoo asserts that a "series circuit" requires not only that the elements in

United States District Court
For the Northern District of California

1  the circuits be connected end-to-end but also that the same current run through them.  Daewoo

2  defines "series circuits" as "circuits in which the circuit elements are arranged in sequence so that the

3  same current flows through each of them in turn."  Press '538 Motion Decl., Ex. 4 (Sperber Report)

4  at 12 (quoting Oxford Dictionary of Physics, 4th Ed. 2003).  According to Daewoo, its accused

5  products do not satisfy this limitation because the current that flows through L202 is not the same as

6  the current that flows through P201 and P202.  *Id.*  Sperber explains his conclusion as follows:

> An examination of Daewoo's oscillator circuit . . . depicts R231 in parallel with L202.  Therefore a portion of the tank circulating current passing through the FE and AE heads is diverted to R231, and the current flowing through L202 is different than the current through the FE and AE head inductances because of the flow of the emitter current to ground through L202 and only the tank circulating current flowing through the FE and AE heads.  Therefore, L2020 is not in series with P202 and P201.

12  *Id.*

13  In construing claim terms, courts begin by looking at the claim terms and specification to

14  determine the ordinary and customary meaning that would be attributed to the terms by one who is

15  skilled in the field of the invention.  Here, Funai asserts that Daewoo's definition of "series circuit"

16  is inconsistent with the inventors' usage of that term in the specification, pointing in particular to the

17  elements that are explicitly identified as making up "series circuits" in Figures 2 and 5 and which,

18  according to Funai, have different current flowing through them.  *See* '538 patent, fig.2, and col.

19  3:63-66 ("[t]he junction point between the capacitor C11 and the capacitor C12 is connected to a

20  series circuit 20 formed by an entire-width erasing head 16 and a linear erasing head 18"); fig.5 and

21  cols. 14-16 ("the Fig. 5 embodiment has a series circuit configured by the entire-width erasing head

22  16, the linear erasing head 18 and the inductor L1.").

23  With respect to Figure 2, Funai supports its conclusion by pointing to the specification where

24  it states that the current flowing through the entire-width erasing head in Figure 2 is different from

25  the current that flows through the linear erasing head: "Where erasing a recorded signal from a video

26  tape shown in Fig. 3, the high frequency currents I1 and I2 respectively flow through the entire-width

United States District Court

For the Northern District of California

1   erasing head 16 and the sound erasing head 18 . . . ." '538 patent, col. 4:35-38.[21]  As to Figure 5,

2   Funai points to the specification where it states that current I11 flows through the entire-width

3   erasing head 16 and the linear erasing head 18 but that "the emitter current of the transistor T11

4   flows through only the inductor L1 through the resistor R4 . . . .: '538 patent, col. 5:23-26, 30-35.[22]

5       Daewoo does not respond to Funai's argument as to Figure 2. With respect to Figure 5,

6   Daewoo concedes that the DC current (the emitter current) that comes from transistor T11 passes to

7   ground only through L1 – and therefore, L1 is not "in series" – according to Daewoo's proposed

8   claim construction – as to that current. It argues, however, that these elements are in series as to the

9   *AC* current that circulates through these elements (referred to as the "tank circuit") because the

10  circulating AC current is the same. *See* Declaration of Daniel M. Press in Support of Reply Re

11  Daewoo's Motion for Partial Summary Judgment ("Press '538 Reply Decl."), Ex. 3 (Bristow

12  Deposition) at 47-51 & Ex. 3 thereto. In addition, Daewoo asserts that if Funai's construction were

13  adopted, capacitor C13 in Figure 2 – which Bristow admitted is connected end-to-end to L1, would

14  also be part of the series circuit, yet the specification refers to C13 as being connected "in parallel"

15  with series circuit 20. *Id.* at 52 ("C13 is connected in parallel with head 16, head 18, and L1, and it

16  shares a common connection at the top directly to head 16"); '538 patent, col. 4:7-10.

17      The court adopts Funai's proposed construction of "series circuit" based on the usage of that

18  term in the specification and figures cited by Funai (discussed above) indicating that the inventors

19  did not limit a series circuit in the manner proposed by Daewoo. Therefore, the court construes the

20  term "series circuit" as "a circuit whose components are connected end-to-end in a string." Because

21

22      [21] Earlier in the specification, element 18 is referred to as the "linear erasing head." '538 patent, col. 3:66.

23

24      [22] Funai also points to another patent on which Daewoo's expert was the inventor, United States Patent No. 4,446,407 ("the '407 patent"). *See* Ojha Decl. (Funai '538, '209 and '218 Opposition), Ex.

25  12. According to Funai, Sperber used the term "series circuit" in that patent to describe elements that are connected end to end but where the same current does not flow through some of the elements. The

26  court declines to address these arguments as Sperber's usage of the term "series circuit" in an unrelated patent has little relevance to the court's inquiry in this case. Similarly, the court does not consider

27  Funai's reference to an opinion by Daewoo's Korean counsel that P201, P202, and L202 are connected in series in the accused devices. *See* Ojha Decl. (Funai '538, '209, and '218 Opposition), Ex. 21. Funai

28  has laid no foundation suggesting that the author of that opinion should be considered to be an individual of ordinary skill in the art of the invention.

United States District Court
For the Northern District of California

1 it is undisputed that in the accused products L202, P202, and P201 make up a circuit whose

2 components are connected end-to-end in a string, the court finds that the accused products meet this

3 limitation.

### 2.    "Series Junction Point"

5 Claim Five describes a biasing/erasing oscillator comprising several components, including a

6 series circuit connecting in series through a series junction point said entire-width erasing head and

7 said linear record erasing head. '538 patent, claim 5. According to Daewoo, this limitation requires

8 that the series junction point must be *between* the entire-width erasing head and the linear erasing

9 head. *See* Press Decl. (Daewoo '538 Motion), Ex. 4 (Sperber Report) at 13. Daewoo's expert

10 explains this conclusion as follows:

> The first element of this claim "a series circuit connecting in series
> through a series junction point said entire-width erasing head and said
> linear record erasing head;" is depicted by Fig. 2 of the '538 patent.
> The "**series junction point**" is clearly between the entire-width erasing
> head (item 16, Fig. 2) and linear record erasing head (item 18, Fig. 2).
> Therefore claim 5 clearly places the strasistor emitter connected to the
> above stated junction point between the two erase heads.

15 *Id.* Because it is undisputed that the series junction point shown in the simplified schematic of

16 Daewoo's accused products is *not* between the two heads, Daewoo argues that it is entitled to

17 summary judgment of non-infringement as to the '538 patent.

18 Funai rejects Daewoo's construction, arguing that the claim language does not require that

19 the series junction point be located between the erase heads. Describing the accused devices, Funai's

20 expert states:

> There is in fact a series circuit composed of first the series junction
> point, then one of the AE or FE heads, and then the remaining head. In
> the simplified schematic, one can clearly see the AE head is in series
> with the FE head. The series combination of the FE and AE heads is in
> series with the series junction point. The claim does not require that
> the junction point be located between the AE and FE heads.

25 Bristow '538, '209, and '218 Opposition Decl., Ex. A (Bristow Expert Report) at 20.

26 The court concludes that Funai is correct. The claim language does not require that the series

27 junction point must be *between* the two heads, but only that all three must be in series. The only

28 reason offered by Daewoo's expert in support of its construction is Sperber's statement that that in Figure

68

2, the series junction point is, in fact, between the erase heads. Daewoo thus attempts to limit the claim to a preferred embodiment, even though this limitation is not found in the language of claim 5. Such importation of additional limitations from the specification that are not reflected in the claim language itself is improper. The court, therefore, rejects Daewoo's argument that it is entitled to summary judgment on this basis.

### 3. Bias Voltage to Base of Transistor

All of the asserted claims of the '538 patent contain the following limitation: "a bias resistor for providing a bias voltage to said base." '538 patent, claims 1, 5, 6. It appears to be undisputed that the words "said base" refer to an earlier limitation in these claims calling for a "transistor having a collector and a base." *Id.* The court has construed this limitation as a means plus function term with the function of "providing a bias voltage to said base." The court held that the corresponding structure is "a resistor" and its equivalents. Although Funai characterizes the dispute as to this claim as one of claim construction, there appears to be no disagreement as to the meaning of any particular term within this limitation (the entirety of which was already construed). Rather, the dispute appears to be about whether the accused products actually meet this limitation, either literally or under the doctrine of equivalents.

Funai asserts that this limitation is met in the accused products by Resistor R223 in the simplified schematic. *See* Bristow '538, '209, and '218 Opposition Decl., Ex. A (Bristow Expert Report) at 21 ("Resistor R223 provides a bias voltage to the base of transistor Q202, and this limitation is therefore met"). Daewoo disputes this assertion however, arguing that because there is no resistor in the location of R4 in the preferred embodiment, there is no voltage divider which would allow R223 in the accused devices to provide a bias voltage to the base of Q202. Daewoo Motion ('538 patent) at 9-10.

In his expert report, Daewoo's expert explains his conclusion as follows:

> [In the Daewoo accused products] the biasing does not provide a bias voltage, but provides a bias current to said base. Since the emitter of transistor Q202 is returned to DC ground via L202, there is no DC degenerative feedback present and the base is clamped to the emitter by virtue of the Vbe junction. The bias resistor (R223) cannot substantially change the value of Vbe. However, since the collector of Q202 (type KTC3202Y) and bias resistor R223 of the Daewoo

United States District Court
For the Northern District of California

oscillator circuit are returned to ~+5 volts and R223 has a value of 10K ohms, the base bias current is approximately (5-.8)/10K or 0.42 mA. Specifications for the KTC3202Y include Vbe (typ)=0.8v and Beta =150 typical. With a bias current of 0.42mA, the (non oscillating state) collector current is 63mA and the emitter current is 63.4mA typical.

It is the step of turn on base current multiplied by transistor Beta +1 at the emitter that induces a positive step of voltage across L202 (VL202 =L*di/dt). This voltage step will generate a circulating tank current passing through the AE and FE head inductance and returning through the resonant circuit capacitor (C219). The resonant frequency of this circulating current will be determined by circuit capacitor C219 and the total inductance in the loop. This oscillation will regeneratively build in level by virtue of resonant current feedback from the emitter to L202 for each positive cycle of tank sine wave coupled to the base.

Press Decl. (Daewoo '538 Motion), Ex. 4 (Sperber Expert Report) at 15.

In Sperber's deposition, he explains the significance of R4 in the '538 invention and why its absence from the accused devices means that Daewoo's devices do not meet the bias voltage limitation. Press Decl (Daewoo '538 Motion), Ex. 5 (Sperber Depo.) at 139-52. According to Sperber, "[t]he only time that a bias resistor network can be considered to impress a voltage on the base" is when there is "a pair of resistors [that] forms what's known as a voltage divider." *Id.* at 144. According to Sperber, in the '538 embodiments, R3 and R4 create such a voltage divider. *Id.* at 141-43. In the accused products, however, there is no resistor similar to R4 and therefore, there is no voltage divider. *Id.* Without this second resistor, Sperber asserts, there is no bias resistor in the accused products that can be "considered to provide a base voltage reference." *Id.* at 144.

Funai does not agree with Daewoo's expert that R223 in the accused products cannot provide a voltage reference because there is no second resistor between Q202 and L202 as there in the '538 embodiments. Funai argues in its Opposition that through the operation of Ohm's law, R223 in the accused product must provide not only a base current to transistor Q202 (which Daewoo does not dispute) but also, a base voltage. Opposition ('538 Motion) at 15. According to Funai's expert:

Ohm's law states that, in an electrical circuit, the current passing through two points in a conductor is directly proportional to the potential difference or voltage across the two points and is inversely proportional to the resistance of the conductor between the two points. Ohm's law is commonly expressed as V (voltage) = I(current) x R (resistance).

1  Bristow '538, '209, and '218 Opposition Decl., ¶16.  Bristow goes on to state that "[c]onsequently, a

2  voltage drop is associated with a given resistance and current.  Therefore, if a resistor provides a bias

3  current to the base of the transistor then that resistor must necessarily provide a bias voltage to the

4  base of that transistor."  *Id.*, ¶ 17.  Bristow does not, however, explain why Sperber's voltage divider

5  argument is incorrect as applied to the accused products.

6      Funai also asserts that even if the accused products do not literally meet this limitation, they

7  infringe under the doctrine of equivalents because "the resistor R223 provides a bias voltage

8  corresponding to a bias current to the transistor Q202, it performs this function by applying the bias

9  voltage to the base of the transistor Q202 resulting [in] the transistor Q202 being turned on and

10  providing electricity to the resonant circuit."  Opposition at 19.

11      Given the conflicting testimony of the parties' experts, the court concludes that there is a

12  factual dispute regarding whether R223 in the accused devices satisfies this limitation.

13      **D.      Conclusion**

14      For the reasons stated above, the court DENIES Daewoo's summary judgment motion on the

15  grounds that: 1) the accused devices meet the "series circuit limitation;" 2) the accused devices meet

16  the "series junction point" limitation; and 3) there is a material issue of fact as to whether the

17  accused devices meet the claim limitation requiring "a bias resistor for providing a bias voltage to

18  said base."

19  **XI.      SUMMARY OF RULINGS**

20      1)      Plaintiff's Summary Judgment Motion ('018 Patent) [Docket No. 376]: GRANTED.

21      2)      Defendants' Summary Judgment Motion ('209 Patent) [Docket No. 379]: GRANTED

22          IN PART and DENIED IN PART.  The court finds that the accused products do not
            infringe the '209 patent, either literally or under the doctrine of equivalents.  The

23          court does not reach Daewoo's arguments concerning invalidity.

24      3)      Defendants' Summary Judgment Motion ('210 Patent) [Docket No. 380]: GRANTED
            on the question of literal infringement of the '210 patent and DENIED on the question

25          of infringement under the doctrine of equivalents. On the question of invalidity,
            Defendants' Summary Judgment Motion ('210 Patent) is DENIED as to both the FM-

26          DECL and the '958 patent.

27      4)      Defendants' Summary Judgment Motion ('218 Patent) [Docket No. 381]:
            GRANTED.  The accused devices do not infringe the '218 patent, either literally or

28          under the doctrine of equivalents.

United States District Court
For the Northern District of California

5) Defendants' Summary Judgment Motion ('332 Patent) [Docket No. 382]: GRANTED in favor of Daewoo the question of infringement on the grounds that the accused devices do not infringe the '332 patent, either literally or under the doctrine of equivalents, as a matter of law. Because the court finds that the accused products do not infringe the '332 patent, the court does not reach Defendants' request for summary judgment of invalidity as to the '332 patent.

6) Defendants' Summary Judgment Motion ('538 Patent) [Docket No. 383]: DENIED on the question of infringement on the grounds that: 1) the accused devices meet the "series circuit limitation;" 2) the accused devices meet the "series junction point" limitation; and 3) there is a material issue of fact as to whether the accused devices meet the claim limitation requiring "a bias resistor for providing a bias voltage to said base."

7) Plaintiff's Summary Judgment Motion ('210 Patent) [Docket No. 385]: DENIED on the question of literal infringement; GRANTED as to invalidity based on FM-DECL; DENIED as to invalidity based on the '958 patent.

8) Plaintiff's Summary Judgment Motion ('332 Patent) [Docket No. 390]: DENIED with respect to the question of infringement. Because the court finds that the accused products do not infringe the '332 patent, the court does not reach Plaintiff's request for summary judgment of no invalidity as to the '332 patent.

IT IS SO ORDERED.

Dated: November 26, 2007

JOSEPH C. SPERO
United States Magistrate Judge

72

# UNITED STATES DISTRICT COURT

## FOR THE

## NORTHERN DISTRICT OF CALIFORNIA

FUNAI ELECTRIC COMPANY, LTD.,

Plaintiff,

v.

DAEWOO ELECTRONICS CORP., ET AL.,

Defendant.

_____/

Case Number: CV04-01830 JCS

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on November 26, 2007, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Archana Ojha
Morgan, Lewis & Bockius LLP
One Market, Spear Street Tower
San Francisco, CA 94105

David C. Bohrer M
Morgan Lewis & Bockius, LLP
3000 El Camino Real, Suite 700
Two Palo Alto Square
Palo Alto, CA 94306

Daniel Mark Press
Chung & Press, P.C
6718 Whittier Ave., Suite 200
McLean, VA 22101

Juan Chardiet
Chung & Press P.C.
6723 Whittier Ave., Ste. 302
McLean, VA 22101

Michael John Lyons
Morgan Lewis & Bockus LLP
3000 El Camino Real
2 Palo Alto Square, Suite 700
Palo Alto, CA 94306

Thomas Kohler
Morgan Lewis & Bockius LLP
One Market
Spear Street Tower
San Francisco, CA 94105-1126

Dated: November 26, 2007

Richard W. Wieking, Clerk
By: Karen Hom, Deputy Clerk

2